10-307-pr
Watson v. Greene

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

August Term, 2010

(Argued: December 10, 2010      Decided: May 17, 2011)

Docket No. 10-307-pr

———————————

DARRELL WATSON,

*Petitioner-Appellee*,

—v.—

GARY GREENE, Great Meadow Correctional Facility Superintendent, ERIC T. SCHNEIDERMAN, New York State Attorney General,[*]

*Respondents-Appellants*.

———————————

Before:

LYNCH and CHIN, *Circuit Judges*, KORMAN, *District Judge*.[**]

———————————

———————————

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), New York State Attorney General Eric T. Schneiderman is automatically substituted for former Attorney General Eliot Spitzer as a respondent in this case. The Clerk of Court is directed to amend the official caption as set forth above.

[**] Honorable Edward R. Korman of the United States District Court for the Eastern District of New York, sitting by designation.

1

Petitioner-appellee Darrell Watson sought habeas relief in the United States District Court for the Eastern District of New York following the state appellate courts' affirmance of his conviction for first-degree murder. The district court (Carol B. Amon, *J*.) granted relief, holding that the state appellate court unreasonably applied clearly established federal law when it determined that Watson's Sixth Amendment Confrontation Clause rights were not violated when the trial court precluded defense counsel from cross-examining a witness about a document that contained multiple hearsay. Respondents-appellants, the Superintendent of Great Meadow Correctional Facility and the New York Attorney General, appeal. We conclude that the state appellate courts did not unreasonably apply clearly established federal law.

We therefore REVERSE the district court's grant of the writ.

_____

WILLIAM B. CARNEY, The Legal Aid Society, New York, New York, *for Petitioner-Appellee*.

VICTOR BARALL, Assistant District Attorney (Leonard Joblove, Assistant District Attorney of Counsel, *on the brief*), *for* Charles J. Hynes, District Attorney, Kings County, Brooklyn, New York, *for Respondents-Appellants*.

_____

GERARD E. LYNCH, *Circuit Judge*:

Respondents-appellants Gary Greene, the Superintendent of Great Meadow Correctional Facility, and Eric T. Schneiderman, the New York Attorney General, appeal from the December 30, 2009, order and judgment of the United States District Court for

the Eastern District of New York (Carol B. Amon, *J*.) granting habeas corpus relief under 28 U.S.C. § 2254 to petitioner-appellee Darrell Watson. Watson had been convicted of first-degree murder for shooting and killing Patrick Morris. At his trial in New York Supreme Court, King's County, Watson admitted that he participated in the robbery during which Morris was shot, but maintained that he was not guilty of first-degree murder because his co-defendant Rakeem Harvey (a/k/a "Keemie") had shot Morris.

Watson's claims are based on a note that the prosecution disclosed to defense counsel (the "Harvey Note"), which stated, in relevant part:

> Keemie Harvey, a/k/a Keemie Cooke.
> Keemie had gun + went off accident.

Defense counsel unsuccessfully sought to cross-examine the lead detective about the Harvey Note in an effort to show that, despite having this information, the police did not adequately investigate whether Harvey was, in fact, the shooter. Watson argues that the preclusion of such cross-examination violated his rights under the Sixth Amendment's Confrontation Clause.

The district court granted habeas, finding that the state appellate courts unreasonably applied clearly established federal law by rejecting Watson's Confrontation Clause argument. Because we conclude that the state courts did not unreasonably apply clearly established federal law, we reverse.

3

## BACKGROUND

### I. The Crime and Investigation

On the night of July 11, 1998, Patrick Morris sat in a parked car in Fort Greene, Brooklyn, waiting for his friends to use the bathroom in a friend's apartment. Watson and Harvey robbed Morris with a gun. Morris resisted, and he was shot and killed. Both Watson and Harvey eventually admitted to participating in the robbery. The principal remaining question was which one of them shot Morris.[1]

The police arrested Watson soon after the incident. When questioned, Watson made a number of contradictory statements. At first, he completely denied any involvement in the crime. Later, he admitted that he was present, but maintained that he only acted as a lookout for Harvey and another man named Jahad. In that account, Watson said that Jahad was the shooter, and that during the crime Jahad was wearing a gray hooded sweatshirt with "Tommy" on the chest and sleeve. Watson's girlfriend, however, told police officers that Watson himself had been wearing a gray hooded sweatshirt when he arrived at her apartment the night of the crime, and gave the sweatshirt to the officers. When confronted with this information and with the sweatshirt itself, Watson provided yet another version of the night's events, admitting that he owned

---

[1] Under New York law, Watson could be guilty of second-degree murder on a felony-murder theory even if he was not the shooter. See N.Y. Penal Law § 125.25(3). The first-degree murder charge, however, depended on a finding that he himself had killed Morris. Id. § 125.27.

the sweatshirt, that he wore it the night of the crime, and that he and Harvey had committed the robbery. He then claimed, however, that Harvey was the shooter and that he had not known that Harvey had a gun. Watson was eventually indicted on ten counts, including first-degree murder.

A few weeks after the crime, Police Officer Sherry Pierce, who was not involved in the investigation of Morris's murder, but whose family knew Harvey's family, telephoned the investigating detectives after seeing Harvey on wanted posters. She reported that she had overheard during a discussion among members of her family that Harvey had a gun on the night of Morris's murder and that it went off accidentally. An unknown detective took notes of this telephone report, creating the Harvey Note, which was placed in the detectives' case file in July 1998. Detective Warren Bond, the lead detective on the case, read it within three months of the crime.

After the crime, Harvey fled to Georgia, where he lived under an alias. When Harvey was arrested there for drunk driving in July 1999, Bond went to Georgia and spent a day and a half questioning him. During that time, Bond never confronted Harvey with the information recorded in the Harvey Note, never told Harvey that Watson's account of the crime placed the gun in Harvey's hands, and never asked Harvey whether he had shot Morris. In fact, according to Harvey, Bond told Harvey at the outset of the interview that he knew Harvey was not the shooter, and that Harvey could therefore help himself by admitting what he had done.

5

Harvey eventually pled guilty to first-degree robbery pursuant to a plea agreement, and later testified against Watson at trial – claiming that Watson was the shooter – in return for a sentence of 8 to 16 years' imprisonment.

## II. The Trial

### A. Disclosure of the Harvey Note and the Defense Response

The prosecutor first disclosed a copy of the Harvey Note to the defense on the second day of jury selection. At that point, the prosecution did not know who had written the Note, or who had reported the information transcribed in it. The prosecution eventually identified Officer Pierce as the source of the information, but the prosecution's efforts to discover which detective had spoken to her were unsuccessful.

When the prosecution interviewed Pierce to learn more about the information in the Harvey Note, Pierce reported that it "was like vague information. . . . She indicated essentially that she heard he was involved. Somebody might have said he had the gun, but she [could not] specify who." Pierce told defense counsel that "there are people in her family that know Mr. Rakeem Harvey a/k/a Rakeem Cook" or know his family, and that she "was in the room and she overheard a number of conversations," which ranged from "Rakeem Harvey did this, that he didn't do it, to him having the gun and didn't have the gun."

The prosecution and the defense both questioned Bond about the Harvey Note outside the presence of the jury. Bond testified that he did not write it and did not know

6

who did.  He testified that he read it within three months of the crime, and that after doing so he contacted Pierce, who told him that she had heard that Harvey had a gun that went off accidentally, but did not tell Bond where she had heard this information.  Bond stated that it was "information that was already basically known that Keemie was involved," so it was "not of any importance to me, because the defendant, Darrell Watson, had already said that Keemie had the gun."[2]

When defense counsel indicated that she wanted to use the Harvey Note at trial, the court asked how defense counsel planned to get it into evidence, and "what is the evidentiary value of that statement [in the Harvey Note] . . . . [i]n view of the fact that it seems to be, at a minimum, [not only] hearsay but double hearsay, and it may[ ]be triple hearsay."  Defense counsel initially argued that it was admissible as a statement against penal interest.  The court rejected that argument because the information did not come from Harvey.

Defense counsel subsequently proposed to use the Harvey Note in its examinations of Harvey, Pierce, and Bond.  The trial court ruled that: (1) defense counsel could ask Harvey if he had told neighbors or family members that he had a gun that went off

---

[2] Watson's brief to this Court asserts that Bond testified that Pierce's information was not important to him because Bond "'already knew' Harvey was the shooter."  At oral argument, defense counsel again represented that Bond testified that he "already knew that Rakeem Harvey was the shooter."  However, counsel was unable to identify anything in the record indicating that Bond knew or believed that Harvey was the shooter.  There appears to be no evidence that Bond ever said that he knew Harvey was the shooter, as opposed to that he knew that Watson had so claimed.

accidentally; (2) defense counsel could not call Pierce to testify to what she overheard, because Pierce's testimony would have been hearsay; and (3) defense counsel could not examine Bond in front of the jury about the Harvey Note, because Bond had not written it.

Defense counsel objected to the third ruling, arguing that

> we do think we should be able to go into this with Detective Bond, because he's going to testify as to what he did pursuant to his investigation in this matter. And if part of the investigation was that he received information that's consistent with Darrell Watson's statement, which is that Rakeem Harvey had the gun, that should be an area of inquiry if Detective Bond was the one who apprehended Rakeem Harvey and questioned Rakeem Harvey and took a statement from Rakeem Harvey, [in] which [Harvey] disavowed any knowledge of the gun, and said he never had the gun. Certainly, we should be able to say, you had this information. You confirmed this information, and you chose not to question him about it. That goes with our theory that the People have not sufficiently investigated Rakeem Harvey as the person with the gun.

The court denied defense counsel's application.

B. Bond's Testimony and Defense Counsel's Second Application to Cross-Examine Bond on the Harvey Note

After Bond's direct testimony to the jury about his investigation of the crime, defense counsel renewed its application to cross-examine him on the Harvey Note in order to show that Bond "had information that he confirmed that came from another police officer that she had heard that Rakeem Harvey had the gun, and he chose not to

8

pursue that." Defense counsel argued that, in the absence of cross-examination on the Harvey Note, "the jury is going to be left with the impression that the only person who said, and the only information that the police had to place the gun in Rakeem Harvey's hands is Darrell Watson, and that's not true." The court rejected the application, stating that "[a]t a minimum, this is triple hearsay," and that the Harvey Note was a "red herring, and I am not going to allow it."

On cross-examination, defense counsel elicited a number of statements supporting the defense theory that Bond had prematurely determined that Watson was the shooter before even talking to Harvey, and that Bond did not adequately investigate the possibility that Harvey was, in fact, the shooter. For example, the cross-examination elicited testimony that by the time Bond questioned Harvey he knew that Watson had been indicted for first-degree murder, that during the day and a half Bond spent with Harvey, neither he nor any other detective – to his knowledge – ever asked Harvey whether he had shot Patrick Morris, and that Bond never informed Harvey that Watson had accused him of having the gun.

C. Further Information About the Harvey Note and Defense Counsel's Third Application to Cross-Examine Bond About It

During the trial, Pierce again spoke with members of her family who had provided information about Harvey. As a result, her sister, Sonjia Pierce, contacted an investigator. The prosecution reported that Sonjia Pierce "said that she had gotten information about

Keemie's role in this from Keemie's mother saying that she heard that Keemie said that he had the gun." When the prosecution contacted Harvey's mother, however, she denied ever saying such a thing to Sonjia Pierce.

When the prosecution informed the court about this development after Bond's testimony, the defense renewed its application to cross-examine Bond on the Harvey Note, arguing that this new information "gives us further basis to go into it." The court again declined, stating that the new information only reinforced its earlier finding that the information constituted multiple levels of hearsay, and that the court still did not "see what the probative value is in questioning the detective regarding that statement."

D. Eyewitness Testimony

At trial, Harvey testified that he saw Watson playing with a silver handgun a few hours before the crime. Harvey also described the robbery and homicide, claiming that Watson had shot Morris. As for the investigation, Harvey testified that when Bond questioned him about the crime, Bond "was just explaining to me, he know that I didn't kill the guy. And instead of coming here and try to win at trial and possibly getting my whole life taken away, he thought it was best that I do the best thing, which is help myself out." That testimony further bolstered defense counsel's theory that the police did not thoroughly investigate whether Harvey was the shooter. On cross-examination, defense counsel, without referring to the Harvey Note, twice asked Harvey if he had told someone in his family that he had a gun that went off accidentally. He denied doing so.

10

In addition to Harvey, six non-participant eyewitnesses testified at trial. None of them saw the shooting itself. One witness testified that he hosted a party the night of the crime and he saw Watson there "more than usually high" and with a gun in his waistband.

Three of Morris's friends testified to what they saw after the shooting. Ramcess Jean-Louis testified that he ran out of the apartment after he heard gun shots, and saw two men near the passenger side of the car in which Morris was sitting. When he got four or five feet away from the car, one of the men turned around and said "I didn't hear anything. Nothing happened." Jean-Louis testified that he saw a silver gun in the hand of that man, who was light-skinned and wearing glasses, and that the other man, who was darker-skinned and not wearing glasses, was leaning his body into the car.[3] Morris's other two friends, Curt Phillips and Loren Hillery, who also ran out of the apartment but were farther away from the car than Jean-Louis, both testified that they saw a darker-skinned and a lighter-skinned man standing by the car, and that it was the lighter-skinned man who spoke to Jean-Louis.[4] Each testified that he could not see a weapon in either man's hands.[5]

---

[3] The defense never disputed that Watson was lighter-complected than Harvey, and in addition to the sweatshirt that Watson had at one point attributed to the shooter, the police recovered a pair of glasses belonging to Watson from his girlfriend.

[4] Phillips and Hillery later identified Watson in line-ups and in court as the lighter-skinned robber. Jean-Louis was unable to do so.

[5] The three friends' testimonies contain some inconsistencies that go to the strength of the prosecution's case. If we determined that there was constitutional error here, we would have to conduct a harmless-error analysis, see Delaware v. Van Arsdall, 475 U.S. 673,

11

Two bystanders also testified. Both stated that they saw two men doing something by the passenger side of the car, that they heard a "pop," and that they did not see whether either man was holding a gun.

E. Closing Arguments

In summation, defense counsel argued that although Watson participated in the robbery of Morris, Watson was not the shooter, was unarmed, and did not know that Harvey had a gun. The prosecution, for its part, noted that both men admitted to participating in the robbery, so that the only question was which one shot Morris. After describing the investigation and touting its high quality, the prosecution argued that the evidence, including the testimony of Harvey, Jean-Louis, and the party host, as well as his own contradictory statements, pointed to Watson as the shooter.

## III. Procedural History

The jury convicted Watson of first-degree murder, and the court sentenced him to imprisonment for 25 years to life. Watson appealed, arguing, inter alia, that: (1) by precluding cross-examination of Bond on the Harvey Note the trial court deprived Watson of his Sixth Amendment Confrontation Clause right to cross-examination; and (2) the late disclosure of the Harvey Note violated Brady v. Maryland, 373 U.S. 83 (1963). The Appellate Division rejected both arguments, without specifically discussing the

684 (1986), and the strength of the prosecution's case, including inconsistencies in testimony, would be at issue. Since we find no constitutional error, however, we need not further address these issues.

12

Confrontation Clause claim, People v. Watson, 793 N.Y.S.2d 89 (2d Dep't 2005), and the New York Court of Appeals denied leave to appeal, People v. Watson, 5 N.Y.3d 771 (2005).

Watson then filed his habeas corpus petition in the district court, reasserting both of the arguments set forth above. The district court rejected the Brady argument,[6] but granted habeas based on Watson's Confrontation Clause claim, finding that the Appellate Division had unreasonably applied clearly established federal law entitling a criminal defendant to a meaningful opportunity to cross-examine adverse witnesses. Watson v. Greene, No. 06-cv-2212 (CBA), 2009 WL 5172874, at *20-*25, *30-*36 (E.D.N.Y. Dec. 30, 2009). The district court noted that the precluded cross-examination went to the thoroughness of the police investigation, noting that "[t]he Supreme Court has recognized the importance of this line of questioning" in Kyles v. Whitley, 514 U.S. 419 (1995). Id. at *22. After determining that the constitutional error was not harmless, id. at *25-*30, the district court granted Watson's habeas petition, id. at *37.

Although we respect the district court's careful and thoughtful analysis of Watson's Confrontation Clause argument, we disagree with its conclusion.

## DISCUSSION

### I. Standards

A. AEDPA

---

[6] Watson does not appeal this ruling, so we need not address it.

13

Under the Antiterrorism and Effective Death Penalty Act of 1996, the question we must answer to determine if Watson is entitled to habeas relief is not simply whether the trial court abused its discretion by precluding cross-examination of Bond on the Harvey Note.  See United States v. Figueroa, 548 F.3d 222, 226 (2d Cir. 2008) (decision to restrict cross-examination reviewed for abuse of discretion).  The question "is instead whether the determination of the [state appellate court] that there was no abuse of discretion was an 'unreasonable application of . . . clearly established Federal law.'" Renico v. Lett, 130 S. Ct. 1855, 1862 (2010), quoting 28 U.S.C. § 2254(d)(1).[7]

---

[7] AEDPA provides in part as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1).  Watson does not argue that the state appellate court decision was "contrary to" clearly established federal law.

We apply AEDPA deference only if the state court has disposed of a claim "on the merits."  Besser v. Walsh, 601 F.3d 163, 179 (2d Cir. 2010) (internal quotation marks omitted).  Although the Appellate Division did not discuss its reasons for rejecting Watson's Confrontation Clause claim, it held that the claim was "either . . . unpreserved for appellate review, without merit, or [did] not require reversal."  People v. Watson, 793 N.Y.S.2d at 90. That holding constitutes a decision "on the merits" that is entitled to AEDPA deference.  See Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006); Jimenez v. Walker, 458 F.3d 130, 146 (2d Cir. 2006).

14

"A legal principle is 'clearly established' within the meaning of [AEDPA] only when it is embodied in a holding of [the Supreme] Court." Thaler v. Haynes, 130 S. Ct. 1171, 1173 (2010). The Supreme Court has explained that

> an *unreasonable* application of clearly established federal law is different from an *incorrect* application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable. This distinction creates a substantially higher threshold for obtaining relief than [that which applies on] *de novo* review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt.

Renico, 130 S. Ct. at 1862 (emphasis in original; citations and internal quotation marks omitted).

Where state court decisions are guided only by general constitutional standards (as opposed to specific, bright-line rules), the "unreasonable application" standard is particularly difficult to meet, because such decisions are given a particularly generous benefit of the doubt. The Supreme Court has stated that:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires

15

considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. 652, 664 (2004); see also Renico, 130 S. Ct. at 1864.

As discussed below, Supreme Court precedent interpreting the Confrontation Clause establishes only general rules that give trial judges "wide latitude" to restrict cross-examination, Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986), subject only to the equally general requirement that the defense be given a "meaningful opportunity" to test the credibility of prosecution witnesses, see Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" including through cross-examination (internal quotation marks omitted)); see also Brinson v. Walker, 547 F.3d 387, 392 (2d Cir. 2008) (noting criminal defendant's right to a "meaningful opportunity" to cross-examine adverse witnesses).

B.  Restrictions on Cross-Examination

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  We have noted that "[i]t is a clearly established principle of Supreme Court jurisprudence that the Confrontation Clause requires that a criminal defendant be afforded a meaningful opportunity to cross-examine witnesses

16

against him." Brinson, 547 F.3d at 392.[8]

Cross-examination is "critical for ensuring the integrity of the fact-finding process" because it is "'the principal means by which the believability of a witness and the truth of his testimony are tested.'" Kentucky v. Stincer, 482 U.S. 730, 736 (1987), quoting Davis v. Alaska, 415 U.S. 308, 316 (1974). There is therefore "a strong presumption that any testifying witness should be subject to cross-examination." Cotto v. Herbert, 331 F.3d 217, 229 (2d Cir. 2003). "[T]he cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." Davis, 415 U.S. at 316.

The Supreme Court has found Confrontation Clause violations when a trial court has prohibited *all* inquiry into an issue that is important to the jury's assessment of a witness's credibility. See, e.g., Van Arsdall, 475 U.S. at 679.[9] The right to cross-examination, however, is not unlimited. In Delaware v. Van Arsdall, the Supreme Court stated that, although the right to cross-examine is important,

---

[8] See also Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987) (plurality opinion); Van Arsdall, 475 U.S. at 678; Davis v. Alaska, 415 U.S. 308, 316-17 (1974); Smith v. Illinois, 390 U.S. 129, 131 (1968); Pointer v.Texas, 380 U.S. 400, 404 (1965); Greene v. McElroy, 360 U.S. 474, 496-97 (1959).

[9] See also Davis, 415 U.S. at 317-20 (trial court violated Confrontation Clause by entirely prohibiting defense counsel from questioning witness about juvenile record); United States v. Maldonado-Rivera, 922 F.2d 934, 955 (2d Cir. 1990) ("The court should avoid any blanket prohibition on exploration of an area that is central to an assessment of the witness's reliability.").

17

> [i]t does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

Id., quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (emphasis in original).

The "extent" of cross-examination "rests in the sound discretion of the trial judge." District of Columbia v. Clawans, 300 U.S. 617, 632 (1937). To determine the propriety of cross-examination, as with other determinations of admissibility of evidence, courts balance prejudice versus probative value. Cf. Wade v. Mantello, 333 F.3d 51, 62 (2d Cir. 2003) (affirming denial of habeas relief where trial court excluded testimony after balancing prejudice versus probative value). A court's decision to restrict cross-examination will be reversed only when the court has abused its "broad discretion." Figueroa, 548 F.3d at 226; see also Brinson, 547 F.3d at 394 ("trial judges enjoy broad discretion" to restrict cross-examination).

Combining the standard for restricting cross-examination with the AEDPA standard, in order to grant Watson's habeas petition we would have to conclude not only that the trial court abused its "broad discretion" by precluding cross-examination of Bond

18

about the Harvey Note, but also that the Appellate Division could not reasonably have determined that the Note would have been excludable had the trial court properly applied "'standard rules of evidence' concerning admissibility." Wade v. Mantello, 333 F.3d 51, 62 (2d Cir. 2003), quoting Taylor v. Illinois, 484 U.S. 400, 410 (1988). We cannot so conclude.

## II. Application

In this case, defense counsel, in an attempt to cast doubt on the sufficiency of the investigation, sought to cross-examine Detective Bond on a document that indicated that Officer Pierce – who was not involved in the investigation of this case – had heard a rumor from her sister, who claimed to have heard it from Harvey's mother, that it was Harvey who had the gun. The trial court, although allowing other examination on the thoroughness of the investigation, precluded this particular line of cross-examination because it found that probative value of the Harvey Note was highly questionable given that it contained multiple hearsay.

We agree with the district court that cross-examining Bond on the Harvey Note might have had some probative value. If the jury had been allowed to hear that Bond had received information – in addition to Watson's self-serving statements – suggesting that Harvey was the shooter, then the jury might have been more concerned about whether Bond had prematurely concluded that Watson was the shooter, and had failed to investigate diligently the possibility that it was Harvey who had shot Morris. Thus, to the

extent that the trial judge excluded the evidence based on a finding that cross-examination on the basis of the Harvey Note was entirely without probative value, we are not persuaded.

On habeas corpus, however, we do not sit to review the trial judge's exercise of discretion, but rather to assess whether the state courts' denial of Watson's Confrontation Clause claim was reasonable. As the Supreme Court has recently stressed, even "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was *no* reasonable basis for the state court to deny relief." Harrington v. Richter, 131 S. Ct. 770, 784 (2011) (emphasis added). Here, the Appellate Division affirmed the conviction without an explicit discussion of the Confrontation Clause claim. But a reasonable basis for affirming the trial judge's exclusion of the proposed cross-examination may be readily inferred.

In determining whether to admit evidence or permit cross-examination, a trial judge typically exercises discretion by balancing the probative value of the evidence against the potential for unfair prejudice. The trial court here did not express its ruling explicitly in terms of such balancing; nevertheless, we would be hard pressed to hold that a decision excluding the cross-examination on balancing grounds was unreasonable. While cross-examination on the Harvey Note may have had probative value, that value is significantly diluted because the information in the Note was derived from multiple hearsay, and the jury reasonably could have determined that Bond's decision not to

20

follow up on unreliable information that Harvey was the shooter – particularly in light of the strength of the evidence then available to Bond – did not reflect a serious lack of thoroughness in the police investigation.

At the same time, however, a trial judge could reasonably accord substantial weight to the possibility that a jury would be confused by the admission of a hearsay statement. Indeed, while it is not clear exactly what the trial court meant when it characterized the Note as a "red herring,"[10] the remark suggests that the judge was concerned with the possibility that the jury would be misled or distracted by the suggestion that the Note was substantive evidence that Harvey was the shooter. Even if the trial court were read as finding the non-hearsay value of the Note totally irrelevant, rather than of limited probative value, we still could not say that the Appellate Division's affirmance – to which AEDPA deference is owed – was unreasonable. A decision affirming the exclusion of the evidence as not a clear abuse of discretion, on the ground that the Note's probative value was outweighed by its potential to mislead or distract the jury would not be an unreasonable application of Supreme Court law, in light of the broad discretion consigned to trial judges by the Court's Confrontation Clause jurisprudence, and the broad deference given to the state courts in applying that jurisprudence. Under the limited standard of review that we apply on habeas corpus, we cannot say that a

_____

[10] A "red herring" is defined as "[a] clue or piece of information which is or is intended to be misleading, or is a distraction from the real question." Oxford English Dictionary Online (3d ed. 2011).

21

decision to exclude a document that a reasonable trial court could have excluded amounts to a violation of Watson's constitutional rights.

As the district court's thoughtful analysis demonstrates, not every judge would agree with the balance struck by the trial judge in this case. We need not decide, however, whether we would have pursued the same course. Because courts have "considerable leeway" to balance these factors in evidentiary decisions, see Gueits v. Kirkpatrick, 612 F.3d 118, 127 (2d Cir. 2010), and because "the type of evidentiary ruling challenged in this case is afforded wide latitude by the Constitution," Wade, 333 F.3d at 60, we cannot conclude that the trial court so clearly abused its discretion that the state appellate court's failure to find an abuse of discretion was an unreasonable application of clearly established federal law. See Cruz v. Miller, 255 F.3d 77, 86 (2d Cir. 2001) ("[I]n making the 'reasonable application' determination, [federal courts] look to the result of a state court's consideration of a criminal defendant's claim . . . . [D]eficient reasoning will not preclude AEDPA deference, . . . at least in the absence of an analysis so flawed as to undermine confidence that the constitutional claim has been fairly adjudicated.").

Watson argues that the trial court violated his Confrontation Clause rights by imposing a "blanket prohibition on an area central to Bond's reliability, the thoroughness of the investigation." But this mischaracterizes the record. The trial court did not prohibit all inquiry into the thoroughness of the investigation. Rather, it allowed defense

counsel to inquire into this topic on cross-examination, and, as discussed above, defense counsel did so, eliciting a number of statements going to the thoroughness of the investigation, including Bond's testimony that, far from vigorously interrogating Harvey about his version of events, or confronting him with Watson's statement that Harvey had been the shooter, he had told Harvey from the beginning of the interview that he knew Harvey was not the shooter – a tactic that would surely have comforted Harvey that he had nothing to fear, and everything to gain, from confirming what the police already believed.  The trial court imposed only a limited restriction that precluded questioning of Bond about the Harvey Note.  Accordingly, Watson's argument that the trial court entirely prohibited inquiry into the thoroughness of the investigation lacks foundation in the record.

Watson thus had ample ammunition to argue on summation, as he did, that the police had jumped too quickly to the conclusion that Watson was the killer, and had passed up the opportunity to test that theory by pressing Harvey (the only other candidate for the role of shooter) as vigorously as they had interrogated Watson.  The principal implication that was denied to Watson by the trial court's ruling was the *illegitimate* inference that there was some actual evidence (as opposed to an unreliable rumor) supporting the alternative theory.  The Appellate Division thus did not unreasonably apply clearly established federal law when it determined that the limited restriction

23

imposed by the trial court did not violate Watson's Confrontation Clause rights.[11]

## CONCLUSION

The trial court's preclusion of cross-examination on the Harvey Note was not so clearly an abuse of its broad discretion to balance the probative and prejudicial aspects of potential cross-examination that the state appellate court's failure to find such an abuse of discretion was an unreasonable application of clearly established federal law. We therefore REVERSE the district court's grant of habeas corpus.

---

[11] Nor is Watson assisted by his assertion that in Kyles v. Whitley, 514 U.S. 419 (1995), the Supreme Court "stressed the importance of allowing the defense to inquire about information not pursued by police investigators." That case addresses only the prosecution's obligation to disclose Brady material. Kyles held that the prosecution improperly withheld evidence that, had it been disclosed, would have "raised opportunities to attack . . . the thoroughness and even the good faith of the investigation." Id. at 445. Kyles provides no guidance about what evidence must be admitted at trial or what lines of questioning must be permitted to ensure a meaningful opportunity to cross-examine adverse witnesses. As noted above, Watson no longer presses any argument that the prosecution here improperly withheld the Harvey Note, and the defense was accorded the opportunity to, and did, challenge the thoroughness of the police investigation.