13-2828-pr
*Julio Alvarez v. Robert Ercole*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2013

(Argued: April 10, 2014        Decided: August 18, 2014)

Docket No. 13-2828-pr

---

JULIO ALVAREZ,

*Petitioner-Appellee,*

– v. –

ROBERT ERCOLE, Superintendent of Green Haven Correctional Facility, and
ANDREW CUOMO, Attorney General of the State of New York,

*Respondents-Appellants.*

---

Before: JACOBS, CALABRESI, and LIVINGSTON, *Circuit Judges.*

Respondents appeal the decision of the District Court for the Southern District of New York (McMahon, J.) to grant Petitioner-Appellee Julio Alvarez a writ of habeas corpus under 28 U.S.C. § 2254 based on the New York state trial court's violations of Alvarez's Sixth Amendment Confrontation Clause right. Alvarez was convicted of manslaughter and assault for a 2002 shooting that killed Bronx drug dealer Daniel Colon and wounded two others. Alvarez is serving a 45-year prison sentence. At trial, the state court prohibited Alvarez from questioning a detective as to whether the police had pursued provided leads contained in an investigative report. It did so on the ground that the proffered cross-examination

1

would lead to the introduction of inadmissible hearsay, and also that the proposed line of questioning had the potential to confuse the jury due to the purportedly insufficient connection between the cross-examination and Colon's death. Because the trial court erred when it excluded all cross-examination related to the report, and because this error denied Alvarez evidence that was essential to his defense, we AFFIRM the District Court's order granting Alvarez's habeas petition.

WILLIAM CARNEY, The Legal Aid Society, New York, N.Y., *for Petitioner-Appellee*.

CYNTHIA A. CARLSON (Joseph N. Ferdenzi and Mary Jo L. Blanchard, *on the brief*), *Assistant District Attorneys*, for Robert T. Johnson, *Bronx County District Attorney*, Bronx, N.Y., *for Respondents-Appellants*.

---

CALABRESI, *Circuit Judge*:

Petitioner-Appellee Julio Alvarez was sentenced in 2004 to 45 years' imprisonment for shooting and killing Daniel Colon and wounding two others. At trial, Alvarez's defense strategy was to show that the New York City Police Department investigation had been incomplete in ways that created reasonable doubt that the government had proved its case against him. In support of this argument, Alvarez sought to cross-examine the lead detective to show that the police had not investigated leads provided by a witness, Edwin Vasquez, whose

2

tips were memorialized in a detective's notes and an investigative DD5 report. The trial court prohibited Alvarez from pursuing this line of questioning, ruling that it would lead to the introduction of impermissible hearsay. But Alvarez sought to cross-examine the detective about the Vasquez report in order to show that the police had not pursued known leads, and not to show that the content of the Vasquez report was true. Hence, the trial court's ruling was error. Moreover, by further cutting off this line of questioning through an alternate "clear link" ruling, the trial court effectively denied Alvarez the opportunity to develop his only defense. Taken together, the trial court's evidentiary rulings unreasonably applied clearly established Sixth Amendment law and drastically impaired Alvarez's ability to present that defense.

This error was by no means harmless because (as the district court observed) "[t]here was no forensic evidence tying [Alvarez] to the crime—no ballistics, no DNA, no fingerprints"; the eyewitnesses differed as to the color, make, and features of the car from which the killers fired; one victim failed to identify Alvarez until the police told him "we got the guy" and took him to a line-up; and the prosecutor, on summation, called criticism of the police

3

investigation "speculation" and "submit[ted] to" the jury that the detectives "did a good job on this case" and "followed up on leads."

We therefore affirm the judgment of the District Judge (McMahon, J.) granting Alvarez's habeas petition under 28 U.S.C. § 2254.

## I.    BACKGROUND

### A. Homicide in Hunts Point, New York

Around 2:30 p.m. on Saturday, April 6, 2002, Margie Rodriguez heard gunshots from the street below her Hunts Point, Bronx apartment and called 911. From her sixth floor window, Rodriguez saw two men drive off in a gray car with a distinctive sunroof. Daniel "Dapper Dan" Colon, a local drug dealer, had been shot twice and lay dying in the street.

Moments earlier, Dan Colon had met with two teen-aged crack dealers: 15 year-old Manny Colon (no relation to Dan) and 19 year-old Aramis Fournier.[1] Dan, Manny, and Fournier had discussed a recent police raid on their stash house at 735 Bryant Avenue. As Dan, Manny, and Fournier walked down Bryant Avenue, a car pulled up; one of its two occupants hopped out, said, "What's up now, Dap?" and then opened fire. Despite gunshot wounds to his leg, Manny

---

[1] To avoid confusion, we refer to Dan Colon and Manny Colon by their first names.

4

fled on foot while Fournier, who was also hit, played dead. Both of the teenagers survived. Dan, however, died en route to the hospital.

NYPD officers questioned Manny and Fournier within hours of the shooting, but neither identified the shooter or the driver. Fournier said that the car was "possibly a Toyota," and Manny described it as "a small gold or silver car." That same day, NYPD Detective Donnelly interviewed Ariel Roche, a car mechanic working on Bryant Avenue. Donnelly jotted notes during the interview, which he turned into a DD5 investigation report. According to Donnelly's notes and the DD5, Roche told Donnelly that, at the sound of gunfire, he had run to the shop's door, facing onto Bryant Avenue. Roche saw an Hispanic male in his twenties get into the back of a four-door gold or gray Maxima or Altima type vehicle. Roche said the man was carrying a gun. Donnelly's notes include Roche's description of watching the gold or gray car back down Bryant Avenue (a one-way street), make a turn, and then head northwest on Hunts Point Avenue. The car, Roche said, had New York plates.

The day after the shooting, a Sunday, Manny told police that he remembered the shooter's name was "Julio." On Monday, April 8, Detective DeSalvo in the 44th Precinct called Detective Monaco in the 41st (who was

investigating Dan's homicide). DeSalvo had detained Edwin Vasquez, a computer technician who claimed to have information about Dan's murder. Detective Monaco interviewed Vasquez, taking hand-written notes which he later turned into a DD5 investigative report. According to the report, Vasquez told Monaco that either late on the night of Dan's murder, or early the following morning, Vasquez's longtime acquaintance "Julio" told Vasquez that he "took care of" his "problem" with a man who had argued with Julio's wife, "Vianchi." In the report's words, Vasquez told the detectives that "the guy who was killed" had insulted both Julio and Vianchi, a slight that Julio could not "let . . . lie." The report also included Vasquez's description of Julio as a Dominican man in his thirties who used the nickname "Chan" or "Chang," drove a gray or charcoal-colored Acura Legend, and hung around a dark-skinned man known as the "General."

The DD5 shows that Vasquez also gave the detective a phone number for Julio. Monaco's notes from this interview include information additional to the DD5 report, like his notation "rips drug dealers—JULIO" on a page with Julio's nicknames, physical description, phone number, and what appear to be directions to Julio's home in Hunt's Point, near the shooting. Below the

6

directions, Monaco also jotted "borrowed 9 mm" and included several possible nicknames for Julio's wife: "His wom[a]n is 'Chena[,]' 'China[,]' or 'Cheena[.]'" Another page of Monaco's notes adds that Julio's "partner," "Herniniel" ("General" in Spanish, according to Monaco) lives in Yonkers. The DD5 report states that Monaco ran a "Nitro" database search using the nicknames that Vasquez gave for Julio. The database produced two potential suspects. But when Monaco showed Vasquez photo arrays containing pictures of these suspects, Vasquez denied recognizing any as "Julio."

On April 9, 2002—three days after the shooting—Detective Alfred showed Fournier a photo array that included Respondent-Appellee Julio Alvarez's image. Fournier did not identify anyone. On April 10, Alfred showed Manny a photo spread, again including Alvarez's photo, whom Manny identified as the shooter. On April 12, almost a week after the shooting, Alfred again showed Fournier a photo spread including Alvarez's picture. Fournier said that Alvarez looked like the shooter but he was not sure, and failed to definitively identify anyone. Learning that the police were looking for him, Alvarez turned himself in and was arrested on April 15, 2002. Detective Alfred told Fournier and Manny, "We got the guy," and asked them to view an in-person lineup, which

included Alvarez. Both shooting victims identified Alvarez.[2] Police searched Alvarez's car pursuant to a warrant and found a box of 9 millimeter bullets in the trunk. The NYPD Firearms Analysis Unit could not link these bullets to any gun used in the shooting.

Over a year before trial, the Bronx district attorney gave Alvarez redacted copies of the DD5 reports and notes from Roche's and Vasquez's interviews. The redacted versions blacked out Roche's name and both witnesses' birthdates and contact information. Vasquez's report included his unredacted, full name in one location as well as the phone number that Vasquez attributed to "Julio." The police apparently never called Julio's number, nor did they use the directions to locate Julio's home. Soon after receiving the Vasquez DD5 report, defense counsel used the number Vasquez attributed to "Julio" to identify "Julio Guerrero," who lived near the shooting on Bryant Avenue, was married to a woman named "Bianchi," and drove a silver Acura. The state court had a bench warrant out for Guerrero's arrest on a minor traffic offense, but Guerrero was never apprehended, and defense counsel could not locate him.

---

[2] The reliability of this in-person identification is not before us on appeal.

Defense counsel also sent a private investigator to Roche's garage address. But the investigator, not knowing Roche's name, hit a wall when each of the employees denied having talked to the police. Despite Alvarez's continued request for the redacted contact information for Vasquez and Roche, the Bronx district attorney refused to disclose it until after jury selection for Alvarez's trial. By that time, Vasquez had moved and changed his phone number, and Roche had relocated to Puerto Rico.

## B. State Court Proceedings

Alvarez proceeded to a jury trial before Bronx County Supreme Court Judge Edward Davidowitz. To testify to the police investigation into Dan's homicide, the state called lead Detective Alfred (Detective Monaco had retired, and the state did not call him.) When defense counsel asked Alfred to explain the investigating officers' reaction to the leads generated by Vasquez (and included in the DD5 report), the government objected that the question called for impermissible hearsay. Defense counsel argued that two avenues permitted the questioning: (1) as a remedy for the state's *Brady* violation (in not disclosing the witness's contact information until trial); and (2) as non-hearsay evidence of the shoddy police investigation, by showing that the police had not tried to track

9

down Vasquez's "Julio." Judge Davidowitz rejected Alvarez's *Brady* claim and agreed with the district attorney that the cross-examination called for impermissible hearsay. The state court explained, "the ultimate conclusion that [defense counsel] want[s] the jury to reach is that had [Detective Alfred] pursued this investigation further, it would have resulted in an arrest of someone else, and that . . . is bringing out hearsay." Plus, the state court ruled, such questioning was barred by a state evidentiary rule requiring a "clear link" between evidence implicating a culpable third party and the defendant's charged crime. *See People v. Primo*, 96 N.Y. 2d 351, 356 (2001). As it happens, the case cited by the state judge eliminated any heightened "clear link" evidentiary standard, choosing instead the "general balancing analysis that governs the admissibility of all evidence." *See id.*

Similarly, the state court prevented Alvarez from cross-examining Alfred about Roche's DD5. Judge Davidowitz again rejected Alvarez's argument that the Roche report should be admitted to remedy the state's alleged *Brady* violation. The state court denied any *Brady* violation had occurred. Moreover, Judge Davidowitz doubted the ultimate value of Roche's DD5. As the Appellate Division observed, Roche's description of the shooter's car was "somewhat

10

equivocal and self-contradictory" and cumulative of Margie Rodriguez's testimony.[3] *People v. Alvarez*, 845 N.Y.S.2d 230, 231 (1st Dep't 2007).

The jury acquitted Alvarez of murder but convicted him of manslaughter and two counts of assault. Judge Davidowitz sentenced Alvarez to 45 years' imprisonment: a 25-year term for manslaughter and two 10-year terms for his assault convictions, each to run consecutively.

## C. § 2254 Proceeding

The Appellate Division affirmed Alvarez's conviction, *People v. Alvarez*, 845 N.Y.S.2d at 232, and Chief Judge Judith S. Kaye of the New York Court of Appeals denied Alvarez's request for leave to appeal, *People v. Alvarez*, 9 N.Y.3d 1030 (2008). Alvarez then filed a habeas petition in the Southern District of New York under 28 U.S.C. § 2254, arguing that (1) the government's delayed disclosure of information for Roche and Vasquez violated *Brady v. Maryland*, 373 U.S. 83 (1963); (2) that the trial court violated Alvarez's Sixth Amendment Confrontation Clause right when it barred all cross-examination of Detective Alfred on the Roche and Vasquez DD5 reports; and (3) the trial court's

---

[3] Rodriguez testified at trial that Alvarez's gold Toyota Camry was not the car she saw the shooters use to leave the crime scene as she watched from her window overlooking Bryant Avenue. She described the shooters' vehicle as a smaller, gray or silver car with an oval-shaped sunroof.

instruction on "transferred intent" violated his right to due process under the Fourteenth Amendment.

District Judge McMahon granted Alvarez's habeas petition, holding that the trial court's decision to bar all questioning of Detective Alfred regarding the Vasquez DD5 was an unreasonable application of Supreme Court precedent interpreting the Confrontation Clause, and that this error prevented Alvarez from receiving a fair trial. The District Court rejected Alvarez's remaining arguments (including his *Brady* claim and his alleged Confrontation Clause violation based on the Roche DD5) because they did not meet the high threshold of the Antiterrorism and Effective Death Penalty Act ("AEDPA").

The government appealed; Alvarez did not cross-appeal. Accordingly, neither the *Brady* nor the Roche confrontation issues are before us. We agree with the District Court that the trial court's decision to prohibit Alvarez from questioning Detective Alfred about the Vasquez DD5 was neither a "reasonable limit[] on . . . cross-examination[]" nor "harmless" error. *Delaware v. Van Arsdall*, 475 U.S. 673, 679-80 (1986). We, therefore, affirm the District Court.

## II.     DISCUSSION

### A. Standard of Review

We review a district court's decision to grant a writ of habeas corpus under § 2254 de novo. *Hawkins v. Costello*, 460 F.3d 238, 242 (2d Cir. 2006). Section 2254, as amended by AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d).  An "unreasonable application" occurs when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  We assess "unreasonableness" objectively.  *See Brinson v. Walker*, 547 F.3d 387, 392 (2d Cir. 2008).  "[A]n unreasonable application of [Supreme Court law] must be objectively unreasonable, [and] not merely wrong." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks omitted).  Yet, the trial court's decision need not

teeter on "judicial incompetence" to warrant relief under § 2254(d). *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).

## B. "Clearly Established" Right to Confrontation

Supreme Court law clearly establishes that, under the Sixth Amendment's Confrontation Clause, a criminal defendant must have "a meaningful opportunity to cross-examine witnesses against him." *Brinson*, 547 F.3d at 392 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987)). *See also Davis v. Alaska*, 415 U.S. 308, 315 (1974) (holding that this confrontation right is applicable to state and federal defendants alike) (citing *Pointer v. Texas*, 380 U.S. 400 (1965)). The Confrontation Clause does not, however, guarantee unfettered cross-examination. *See Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). The trial court has "broad discretion . . . 'to impose reasonable limits on . . . cross examination based on concerns about . . . harassment, prejudice, confusion of the issues, . . . or interrogation that is repetitive or only marginally relevant.'" *Brinson*, 547 F.3d at 394 (quoting *Van Arsdall*, 475 U.S. at 679).

"Combining the standard for restricting cross-examination with the AEDPA standard, in order to grant [a] habeas petition we would have to conclude not only that the trial court abused its 'broad discretion' by precluding

cross-examination . . . but also that the [state appellate court] could not reasonably have determined that the [evidence] would have been excludable had the trial court properly applied 'standard rules of evidence' . . . ." *Watson v. Greene*, 640 F.3d 501, 510 (2d Cir. 2011) (quoting *Wade v. Mantello*, 333 F.3d 51, 62 (2d Cir. 2003)). "On habeas corpus, . . . we do not sit to review the trial judge's exercise of discretion, but rather to assess whether the state court's denial of [the defendant's] Confrontation Clause claim was reasonable." *Id.* at 511. Moreover, for habeas to be warranted, the trial court's denial must not have been harmless, that is, it must have had a "substantial and injurious effect or influence in determining the jury's verdict." *Brinson*, 547 F.3d at 395 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)) (internal quotation marks omitted).

We "start with the propriety of the trial court's evidentiary ruling." *Hawkins*, 460 F.3d at 244 (internal quotation marks omitted). The Bronx County Supreme Court prohibited Alvarez from cross-examining Detective Alfred about the Vasquez DD5 report on the ground that the questions solicited inadmissible hearsay. In this respect, the trial court abused its discretion.

**1.**

The state court's conclusion—that the Vasquez DD5 "contained multiple layers of hearsay, and depended, for its relevancy, on at least some level being true"—would have been correct *had* Alvarez offered the report as a means of establishing the truth of its content (*i.e.,* that the "problem" that Vasquez's friend "Julio" had "t[aken] care of" was the murdered Dan Colon and that when "Julio" called Vasquez soon after the shooting, he was confessing to Dan's murder). *See People v. Alvarez*, 845 N.Y.S.2d at 232. But that was not the object of Alvarez's cross-examination. Alvarez sought to demonstrate that the NYPD had failed to take even obvious, preliminary steps to investigate the leads that were generated by Vasquez's interview—summarized in the Vasquez DD5. Alvarez's strategy, which defense counsel heralded during opening and emphasized in closing, was to show that the NYPD's incomplete investigation indicated that the NYPD had prematurely concluded that Alvarez was the guilty party, and in that way to raise a reasonable doubt that Alvarez was in fact responsible. This defense theory did not depend on the veracity of any of Vasquez's (or, for that matter, Julio's) statements.

**2.**

In a later ruling, the state trial court justified its decision to restrict

Alvarez's inquiry into the Vasquez DD5 by citing a New York evidentiary rule

governing admission of evidence implicating a third party. In *People v. Primo*, the

New York Court of Appeals recently clarified that this rule – formerly known as

the "clear link" rule – requires state trial courts to balance the probative value of

defense evidence implicating a third party against its potential for causing

prejudice and confusion, a standard rule of evidence. *See* 96 N.Y.2d at 356

(clarifying that state courts should analyze the "admissibility of third-party

culpability evidence under the general balancing analysis that governs the

admissibility of all evidence" and not under any higher standard). The state

court's ruling on this alternate ground was also clearly unreasonable under

established Sixth Amendment law: not only was it incorrect, but it left Alvarez

without any means of supporting his defense theory. *See Olden v. Kentucky*, 488

U.S. 227, 232 (1988) (per curiam) (reversing conviction where "the limitation

[placed on cross-examination] was beyond reason" given its centrality in

undermining a lead witness's testimony). For the reasons that follow, we

therefore conclude that the trial court abused its discretion and "could not

17

reasonably have determined" that this line of questioning was precluded under the proper application of this rule, as well as "standard rules of evidence concerning admissibility." *See Watson*, 640 F.3d at 510 (internal quotation marks omitted).

First, the trial court's application of *Primo* was wrong – and unreasonably so – under this standard balancing test. Alvarez's counsel specifically argued that the purpose of the line of questioning regarding the Vasquez DD5 was not to show that an alternate perpetrator had in fact committed the crime, but was pursued to demonstrate that there was an alternate suspect that the police had disregarded in their investigation. The trial court's ruling instead was entirely predicated on the assumption that Alvarez was trying to present evidence of "third-party culpability."

Second, the trial court's grounds for barring this line of inquiry were seriously flawed. On the probative value side of the scale, there is no doubt that the content of the DD5 supported an inference that the police did not pursue the lead provided to them by Vasquez – an omission that could have led the jury seriously to doubt the adequacy of the murder investigation. But this fact was wholly overlooked by the state court. On the contrary, the judge asserted that

18

Vasquez's description in the DD5 "does not, in my judgment, match the Defendant" because there was "an automobile that's described that does not fit any automobile that I know of that's involved in this case," nor was there any other evidence of a dispute between Dan Colon and "a Julio" or his wife. There are certainly enough parallels, however, that could be drawn between the alternate suspect and the information the police had about the murder to make Julio Guerrero a person of interest in the investigation: Guerrero's first name, his general physical characteristics, and his automobile's color and appearance were consistent with the descriptions given to the police by eyewitnesses to the shooting. And had detectives investigated the lead, they would quickly have learned that Guerrero lived not far from the crime scene.

Of course, there was a risk that the jury would have interpreted this line of questioning to suggest Julio Guerrero's guilt of the crime – the type of confusion or unfair prejudice this rule was intended to prevent. And as we have said, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits" to avoid such harms. *Watson*, 640 F.3d at 510 (quoting *Van Arsdall*, 475 U.S. at 479). In the unusual circumstances of this case, however, the combined effect of the state trial court's erroneous hearsay and *Primo* rulings

19

entirely precluded Alvarez from fleshing out his main defense theory: that the police investigation into the murder was flawed and had improperly disregarded a promising alternate suspect.

In *Watson v. Greene*, we held that there had been no Confrontation Clause violation when the trial court prohibited the defendant in a homicide prosecution from cross-examining a police witness about the contents of an anonymous phone tip, contained in another officer's note. 640 F.3d at 511. The tip was traced to an off-duty officer who explained that she called in the tip after overhearing her family members repeat rumors relating to another suspect's involvement in the murder. *Id.* at 510. The police never discovered the identity of the officer who recorded her tip. *Id.* at 504. Watson held that the trial court's exclusion was not an "unreasonable" application of Sixth Amendment law for these reasons: (a) the likelihood that the note would cause confusion; (b) the police department's inability to determine the note's author; (c) the strength of the evidence the police already possessed may have indicated to the jury that a disregard of the note "did not reflect a serious lack of thoroughness in the police investigation"; and (d) the fact that the defendant had available to him, and

indeed had introduced, ample alternative evidence to discredit the police investigation. *Id.* at 511-12.

The present case is quite different, for the trial court's exclusion left Alvarez without any support for his theory of the case. And the district attorney repeatedly emphasized that shortcoming in summation, labeling as "speculation" criticism of the police investigation and "submit[ting] to" the jury that the detectives "did a good job on this case" and "followed up on leads." "By thus cutting off all questioning about an event the State conceded had taken place," the state court disabled Alvarez from contradicting Detective Alfred's portrayal of the NYPD investigation as thorough and reliable. *See Van Arsdall*, 475 U.S. at 677, 679 (the Confrontation Clause is violated when "the trial court prohibited *all* inquiry into" a potential source of bias on the part of a witness, a ruling that "kept from the jury facts . . . that were central to assessing [the witness's] reliability"); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (holding that state evidentiary rules "may not be applied mechanistically to defeat the ends of justice" where the result is the exclusion of "testimony . . . critical to [the] defense"). Moreover, we cannot determine regarding the Vasquez lead (as the panel could in *Watson* as to the anonymous note) that the disregard of the lead,

given the relative weakness of the case against Alvarez, would not have been taken by the jury as "reflect[ing] a serious lack of thoroughness in the police investigation." *See* 640 F.3d at 511. Accordingly, we conclude that the trial court's total exclusion of inquiry into the Vasquez DD5 was an "unreasonable application" of clearly established Sixth Amendment law.

Was it, however, harmless?

## C. Harmless Error Analysis

"[B]ecause of the deference we afford to state courts, we 'find an error harmless unless it had substantial and injurious effect or influence in determining the jury's verdict.'" *Corby v. Artus*, 699 F.3d 159, 169 (2d Cir. 2012) (quoting *Fry v. Pliler*, 551 U.S. 112, 116 (2007)). The Supreme Court in *Delaware v. Van Arsdall* listed the following factors to determine whether a state trial court's exclusion of evidence amounted to harmless error: (1) "the overall strength of the prosecution's case;" (2) "the importance of the witness'[s] testimony;" (3) "whether the testimony was cumulative;" (4) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points;" and (5) "the extent of cross-examination otherwise permitted." 475 U.S. at 684. The state has a "significant burden of persuasion" to convince the court

that any error was harmless. *Fry*, 551 U.S. at 122 (Stevens, J., concurring in part and dissenting in part).

All five Supreme Court factors favor Alvarez. *See Van Arsdall*, 475 U.S. at 684. The importance to the defense of cross-examining Detective Alfred about unpursued leads in the Vasquez DD5 cannot be overstated. Alvarez's strategy was to introduce enough suspicion about the thoroughness of the NYPD investigation to plant a reasonable doubt that the government met its burden of proof. By excluding this entire line of questioning, the trial court deprived Alvarez of evidence essential to his primary defense. Moreover, the trial court's ruling deprived Alvarez of *any* supporting evidence, since Vasquez and Guerrero could not be found, and it appears that the state court never agreed to permit Detective Monaco to testify. That is to say, in this case, testimony tending to discredit the NYPD investigation would not have been cumulative; indeed, it would have been Alvarez's only such evidence. *Cf. Corby*, 699 F.3d at 167 (finding no Confrontation Clause violation when, allowed limited cross-examination, the defendant "was able to show that [the witness] had a motive to lie" and "that, to the extent [the witness] would falsely accuse anyone, [the

defendant] was the most plausible candidate.") (internal quotation marks omitted).

By prohibiting Alvarez from questioning Detective Alfred about the Vasquez DD5, the trial court allowed the jury to get the impression that the defense had nothing other than rhetoric to contradict the prosecutor's statement in summation that the NYPD's investigation into Dan Colon's murder was "thorough." *Cf. Davis*, 415 U.S. at 318 (1974) ("[C]ounsel was unable to make a record from which to argue why [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness . . . .") The government capitalized on this evidentiary gap in its summation, characterizing Alvarez's skepticism of the NYPD investigation as plain "speculation." And, having effectively ensured that they would not hear evidence to the contrary, the district attorney assured the jurors, "Detective Alfred, I submit to you, did a good job on this case."

To bolster its harmlessness argument, the state contends, and the First Department agreed, that Julio Guerrero could have been Julio Alvarez's accomplice/passenger—the "two Julios theory," if you will. This possibility, the state tells us, renders any error harmless. *See* Resp'ts' Br. at 61. The notion that two similar-looking fellows named "Julio," with no obvious relationship or common motive, committed the crime together is laughable. But, even apart from this, the failure to investigate Guerrero, whatever his role in the shooting, still reflects poorly on the police investigation of Alvarez. It is hard to believe that the jury would not have found material to its evaluation of the police investigation the government's failure to follow up on Guerrero.

Finally, and of particular significance here, we consider a sixth factor in addition to the Supreme Court's five: "[W]hether the cross-examination of which the defendant was deprived was of a nature that was likely to affect the result." *Brinson*, 547 F.3d at 396. The government's case against Alvarez was "far from overwhelming." *Id.* There was no forensic evidence tying Alvarez to the shooting. The two witnesses who identified Alvarez, Aramis and Manny, did so based on observations made during a shootout—as Manny, wounded, ran from the scene and Aramis played dead in the street. And Margie Rodriguez—shown

25

photographs of Alvarez's car at trial—insisted that his was not the car she had seen fleeing the shooting.

Had the jury additionally known that the police did not pursue Vasquez's tips, it could have concluded that the police prejudged Alvarez's guilt. On this basis, the jury might well have found reasonable doubt that Alvarez was responsible. The jury never heard how Vasquez told Detective Monaco that "Julio" had admitted, on the night of the shooting, that Julio "took care of" his "problem," or that Vasquez had told the police that he understood Julio to be confessing his involvement in Dan Colon's murder. Nor did the jury learn that Vasquez gave the police information to track down Julio—including his physical description, his car make and color, his phone number, his wife's name and nicknames, his sidekick's name and car make, and directions to his house—and that the NYPD, nevertheless, did not pursue any of these leads. A properly instructed jury—clearly cautioned not to treat testimony about the contents of the Vasquez DD5 as evidence of Julio Guerrero's guilt—might, nonetheless, easily have concluded that the NYPD ignored these leads because it had already set its sights on Julio Alvarez. As a result, Alvarez's manslaughter and assault

convictions—gained without the jury's knowledge of the Vasquez DD5—were far from inevitable.

Whether the jury would ultimately have agreed that the police investigation was so wanting as to raise a reasonable doubt about Alvarez's guilt is not for us to decide.  It is sufficient that the jury might well have reached that conclusion, had it learned of the many links—including Guerrero's name, proximity, car color, and "borrowed 9 mm" gun—between Julio Guerrero and the shooting.  But for the trial court's unreasonable interpretation of clearly established Sixth Amendment law and the error that resulted from that interpretation, the jury might well have acquitted Alvarez not only of murder, but of any involvement in the crime.  *See Brinson*, 347 F.3d at 397.

## III.   CONCLUSION

We, therefore, AFFIRM the District Court's order granting Alvarez's petition for habeas relief under 28 U.S.C. § 2254.  The case is remanded to the District Court for further proceedings consistent with this opinion.