**06-0618-pr**
**Brinson v. Walker**

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: May 27, 2008 Decided: November 13, 2008)

Docket No. 06-0618-pr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

JEREMIAH K. BRINSON,

*Petitioner-Appellee*,

-v.-

HANS WALKER, Superintendent of Auburn Correctional Facility,

*Respondent-Appellant*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: KEARSE, LEVAL, and SACK, *Circuit Judges*.

Respondent, on behalf of the State of New York, appeals from the judgment of the United States District Court for the Western District of New York (Bianchini, *U.S.M.J.*), which granted a writ of habeas corpus under 28 U.S.C. § 2254, setting aside Petitioner's New York State conviction for robbery and unlawful possession of a weapon. Respondent contends (1) that the ruling of the New York Supreme Court, Appellate Division, rejecting Petitioner's claim under the Confrontation Clause of the Constitution and affirming his conviction, was neither contrary to, nor an unreasonable

application of, clearly established federal law as determined by the Supreme Court; and (2) that any constitutional error which might be found was harmless. The court of appeals (Leval, *J.*) affirms the grant of habeas corpus.

ROBERT J. BOYLE, Law Office of Robert J. Boyle, New York, NY, for *Petitioner-Appellee.*

ASHLYN DANNELLY, Assistant Attorney General (Eliot Spitzer, Attorney General of the State of New York, Robin A. Forshaw, Deputy Solicitor General for Criminal Matters, *on the brief*), Office of New York State Attorney General, New York, NY, for *Respondent-Appellant.*

LEVAL, *Circuit Judge*:

Respondent Hans Walker, Superintendent of the Auburn Correctional Facility of the State of New York, appeals from the judgment of the United States District Court for the Western District of New York (Victor E. Bianchini, *U.S.M.J.*),[1] which granted a writ of habeas corpus under 28 U.S.C. § 2254, setting aside Petitioner Jeremiah Brinson's New York State conviction of first degree robbery and third degree criminal possession of a weapon, in violation of N.Y. Penal Law §§ 160.15(3) and 265.02(1). Before a jury in the Ontario County Court, Brinson was tried and convicted of the robbery of Jeremy Gavin. He was sentenced as a second violent felony offender[2] to a determinate term of eighteen years imprisonment on the robbery charge, and a five-year

---

[1] The case was heard by Magistrate Judge Bianchini under 28 U.S.C. § 636(c) pursuant to the consent of the parties.

[2] Brinson had previously been convicted of four crimes: petit larceny, burglary, two counts of criminal possession of stolen property, and criminal contempt. Tr. 129-36.

concurrent term for the criminal possession of a weapon charge. He appealed his conviction to the New York State Supreme Court, Appellate Division, claiming, *inter alia*, that the trial court had violated his rights under the Confrontation Clause of the United States Constitution by prohibiting him from cross-examining his accuser regarding the accuser's racial bias as a motivation for his false accusation. The Appellate Division rejected his claim and affirmed the conviction, ruling that there was no right to cross-examine the accuser on such racial bias because it represented "general ill will" rather than "specific hostility toward defendant," and would thus have risked confusing the jury. *People v. Brinson*, 697 N.Y.S.2d 221, 222 (N.Y. App. Div. 4th Dep't 1999).[3] Brinson then brought this petition to set aside his conviction. The district court granted the writ, finding that the Appellate Division's ruling was an unreasonable application of clearly established federal law, as determined by the Supreme Court. We agree and affirm the grant of the writ.

## Background

**I.      The People's Evidence Against Brinson**

Jeremy Gavin, the victim of the alleged robbery, testified on the People's case to the following facts. Around 1:30 a.m. on May 28, 1997, he was walking down Main Street, in Geneva, New York, after having "a few rounds" with some friends at a local bar. Tr. 43. A black man whom he did not know approached him and asked for money. As Gavin was taking money out of his wallet to give him, the man grabbed at the wallet. Gavin tried to push him away, but ended up "sprawled out on the ground." *Id.* at 45. The man pulled out a "razor knife," picked up the money that had fallen out of the wallet – about sixty dollars – and walked away. When the man drew the knife from his pocket,

---

[3] Leave to appeal to the New York Court of Appeals was denied. *People v. Brinson*, 94 N.Y.2d 860 (1999) (Wesley, *J.*).

a piece of paper fell out onto the ground. Gavin started to follow the assailant, but changed his mind because he figured it was a "lost cause" and he "didn't want to get hurt." *Id.* at 48. He picked up his wallet and the piece of paper the assailant had dropped, which turned out to be a Social Security card in the name of Jeremiah Brinson. Gavin was the only witness to those events, other than the robber.

About half an hour later, Gavin went to the local police station. He filed a complaint of a robbery and described the robber as a black man wearing jeans, a white sweatshirt, and a black baseball cap. *Id.* at 42-54. At approximately 2:30 a.m., Officer Mark Cirone of the Geneva Police Department saw Brinson about one-tenth of a mile from the scene of the robbery. Because Brinson matched the description given by Gavin, Officer Cirone took him to the police station, where, at a "show-up" identification procedure, Gavin identified him as the robber. The police found that Brinson was carrying a crack pipe and a knife. The knife matched the description Gavin had given them. Brinson had no money on him. During questioning at the police station, the police confirmed Brinson's Social Security number, and it was the same number as the one on the card that Gavin had brought into the station. *Id.* at 91-112.

**II.** **The Disallowed Cross-Examination and Extrinsic Evidence of Gavin's Racial Bias**

Brinson attempted at trial to develop the theory that Gavin's accusation was a deliberate lie, motivated by Gavin's racial hatred of black people. To this end, Brinson sought to cross-examine Gavin on whether he was fired from his job at the Perkins Restaurant for refusing to serve black patrons (approximately two months after the date of the alleged robbery), having told his supervisor that he would not serve "any fucking Niggers." Tr. 60. Brinson proposed to call the supervisor to testify to Gavin's words in the event Gavin denied it. In addition, Brinson proposed to call Jean Orbaker, an acquaintance of Gavin, to testify that Gavin had used a demeaning racial epithet in her presence. Tr. 122.

4

When Brinson's attorney undertook to cross-examine Gavin on his refusal to serve black patrons at his restaurant job, the prosecutor objected on the ground that the incident was not relevant because it occurred after the date of the alleged robbery. *Id.* at 61 ("Anything that happens after May 28th [the date of the incident] is not relevant."). Once it was established that Gavin's employment at the Perkins Restaurant began in July 1997, approximately two months after the incident, the court sustained the prosecutor's objection on grounds of relevance. Tr. 68. Brinson's counsel asked Gavin whether, during the incident, he had yelled at Brinson, calling him "Nigger," which Gavin denied as "absolutely a lie." Tr. 68-69.

Brinson called Gary Cornue, Gavin's supervisor at the Perkins Restaurant, to testify to Gavin's refusal to serve black customers. Once again the prosecutor objected, arguing that evidence showing Gavin's racial bias on a date subsequent to the incident was irrelevant because it would make "no showing of any racial bias whatsoever at the time of this incident," and further that the events at Perkins were "peripheral, collateral" and would require a "mini trial with respect to complainant's employment." The trial court sustained the objection and precluded Cornue's testimony. *Id.* at 121-22.

Brinson then sought to call Jean Orbaker, an acquaintance of Gavin, who would testify that Gavin had said to her, about a month prior to the trial (Gavin then being employed at a Rite Aid drugstore) that "all the Niggers who came into Rite Aid knew that he's the one that had accused . . . Brinson." Tr. 122-23. The prosecutor objected on grounds that such testimony was "[c]ollateral, irrelevant, . . . not material." *Id.* at 123. The court sustained the prosecutor's objection, finding the evidence "[n]ot relevant" because this evidence of *subsequent* racial bias was "insufficient . . . to show any bias on the date involved in this crime, that being May 28th, 1997." *Id.*

5

### III. Brinson's Version of Events

Brinson offered a much different version. He testified that on the night of the robbery, he saw his friends Joel Richardson and Shawn Dunson in a car, and asked them for a ride. After Brinson got in the car, a white man, who he later learned was Gavin, approached the car and asked Brinson for a "dime bag" of marijuana. Gavin got into the back seat of Richardson's car and sat next to Brinson. Brinson had removed a knife – which he testified was a "carpet cutter" knife he used at his job at the Ramada Inn – from his back pocket in order not to sit on it. Both Brinson and Gavin got out of the car at Pulteney Street. Gavin told Brinson he only had five dollars, but still wanted a "dime bag" (which costs ten dollars). Brinson told Gavin to leave him alone if he didn't have enough money. *Id.* at 137-43.

Brinson said he became suspicious that Gavin was a narcotics detective, and started walking away, but Gavin persisted. Brinson said to Gavin, "[Y]ou are a narc, aren't you?" *Id.* at 144. Gavin then yelled after him, "[Y]ou, Nigger, come here, Nigger[.]" *Id.* Later, after Brinson and Gavin had parted, the police pulled up to Brinson and an officer took him into custody. *Id.* at 143-48.

Brinson said he had lost his Social Security card about one month before the robbery, and had obtained a new one. Brinson said the card Gavin provided to the police was the one that had been missing for over a month. *Id.* at 150-51, 174-75.

### IV. The Appellate Division Ruling

On Brinson's direct appeal following his conviction, he asserted a constitutional challenge based on the Confrontation Clause to the trial court's disallowance of his cross-examination of Gavin on Gavin's racial bias, as manifested by his refusal to serve black patrons at the restaurant. The Appellate Division upheld the trial court's ruling, but on a different ground. Whereas the trial court

had barred the cross-examination (and the extrinsic evidence) on grounds of relevance, in that a showing of Gavin's subsequent bias would not show that he was biased when he accused Brinson, the Appellate Division found the proffered evidence inadmissible because it would demonstrate only "general ill will of the complainant and not his specific hostility toward defendant," so that "the risk of confusing the jury outweighed the probative value of the proof." *Brinson*, 697 N.Y.S.2d at 222.

**V.      The District Court Order Granting the Writ**

In his *pro se* petition for habeas corpus under 28 U.S.C. § 2254, among numerous other contentions, Brinson reasserted his claim that the trial court had denied his right of confrontation in restricting his cross-examination of Gavin on his racial bias. With respect to this claim, the district court found that the Appellate Division "unreasonably applied clearly established Supreme Court precedent." *Brinson v. Walker*, 407 F. Supp. 2d 456, 478 (W.D.N.Y. 2006). The court concluded that the limitations placed on cross-examination on Gavin's racism "deprived the defendant of critical evidence that could have allowed the trier of fact to conclude that the complainant fabricated the robbery accusation." *Id.* at 480. Concluding that the error could not be considered harmless, the court granted the writ, but stayed its order for Brinson's release pending this appeal.

**Discussion**

The People argue that the district court erred in holding that the Appellate Division's ruling constituted an unreasonable application of clearly established Supreme Court law. In the alternative, the People assert that any error was harmless. We reject both arguments.

**I.      Unreasonable Application of Supreme Court Law**

Under § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1219, a federal court may set aside a state

7

court conviction upon a showing by the petitioner that the state court's adjudication of the merits of his claim "resulted in a decision that . . . involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). We must first determine whether the state court's decision involved clearly established federal law, as determined by the Supreme Court, and if so, whether the state court applied it unreasonably.

### A. Clearly Established Federal Law, as Determined by the Supreme Court

It is a clearly established principle of Supreme Court jurisprudence that the Confrontation Clause requires that a criminal defendant be afforded a meaningful opportunity to cross-examine witnesses against him in order to show bias or improper motive for their testimony. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987) (plurality opinion) ("[T]he right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable.") (*citing United States v. Abel*, 469 U.S. 45, 50 (1984)); *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986) ("'[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'") (quoting *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)); *Greene v. McElroy*, 360 U.S. 474, 496 (1959) (stating that "[c]ertain principles have remained relatively immutable in our jurisprudence," including the right of the accused to challenge "the testimony of individuals . . . who . . . might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy").

In *Alford v. United States*, 282 U.S. 687 (1931), the Supreme Court reversed the defendant's conviction on grounds that he was denied the right to question a government witness about the fact that the witness was currently being detained by federal authorities and thus might have a motive to curry

8

favor with the government by providing testimony adverse to the defendant. And years later, in *Davis v. Alaska*, 415 U.S. 308 (1974), the Court reversed the conviction of a defendant who was barred from cross-examining the prosecution witness on the fact that he was on probation for burglary when he assisted the police in identifying the defendant, which the defendant contended was appropriate impeachment because of the witness's motivation to curry favor with the police to protect his probationary status. The Court explained that preventing the defense from putting on this evidence interfered with the defendant's right, protected by the Confrontation Clause, to cross-examine the witness for bias or impeachment purposes. *Id.* at 320-21. Then, in *United States v. Abel*, 469 U.S. 45 (1984), the Court reversed a decision of the Ninth Circuit which found that the district court had erred in allowing cross-examination of a defense witness regarding his membership in a prison gang to which the defendant also belonged. The government had justified these questions as showing the defense witness's bias in favor of the defendant and thus casting doubt on the credibility of his testimony. While the circumstances of the *Abel* case differed from these, in that the challenged cross-examination was conducted by the prosecution rather than the defense (and thus did not implicate the Confrontation Clause), the opinion nevertheless reaffirmed the fundamental Confrontation Clause principle that the accused must be given a broad opportunity to cross-examine adverse witnesses for bias. *See id.* at 50 (noting long-settled principle that "a trial court must allow some cross-examination of a witness to show bias") (citing *Alford*, 282 U.S. at 687, and *Davis*, 415 U.S. at 308).

The People take an exceedingly narrow view of this case law, arguing that *Van Arsdall* and *Davis* – the two cases on which the district court relied in granting the writ – stand for nothing more than the "unremarkable proposition that a defendant cannot be precluded from examining a state witness about benefits the state is giving (or may give) to the witness." Appellant's Br. 37. We do

not agree that the principle of these cases is so narrow. The Court in *Van Arsdall* fashioned its rule in broad terms, holding that "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Van Arsdall*, 475 U.S. at 680. It is hard to conceive of a more "prototypical form of bias" than racial bias. We view these cases as specific examples of the "relatively immutable" principle, stated in *McElroy*, 360 U.S. at 496, that under the Confrontation Clause the accused must be given a full and fair opportunity to cross-examine adverse witnesses for bias that may affect the veracity of their testimony.

In sum, we find that the Appellate Division's decision implicated a clearly established rule, as determined by Supreme Court case law, that the Confrontation Clause protects a defendant's right to cross-examine witnesses for bias. We now turn to whether the Appellate Division unreasonably applied that rule.

### B. Unreasonable Application

"Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000) (O'Connor, *J.*, for the Court).

The Appellate Division ruled that there is no right to cross-examine on racial bias because it represents "general ill will" rather than "specific hostility toward defendant." In our view, at least where the racial bias sought to be exposed is of sufficient intensity that it is reasonably likely to result in the falsification of the witness's testimony against the accused, a preclusion of cross-examination

10

on the ground that racial bias is general and not specifically directed against the defendant is an unreasonable application of Supreme Court decisional law.

As noted above, in *Van Arsdall*, the Court stated that it would be inconsistent with the Confrontation Clause to prohibit the accused from cross-examining a witness against him to show "a prototypical form of bias." 475 U.S. at 680. In *Abel*, the Court had earlier elaborated on the meaning of bias:

> Bias is a term used in the "common law of evidence" to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.

469 U.S. at 52 (citation omitted). It can scarcely be doubted that in the United States racial bias against persons of black skin is a "prototypical" form of bias. And far more important for these purposes than its typicality is the fact that racial bias, at least when held in extreme form, can lead people to lie or distort their testimony, and therefore "might bear on the accuracy and truth of a witness' testimony," *id.*, even though the bias is directed generally against a class of persons and not specifically against the accused.

We recognize that trial judges enjoy broad discretion with respect to the Confrontation Clause "to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679. As the Supreme Court has explained:

> The extent of cross-examination rests in the sound discretion of the trial judge. Reasonable restriction of undue cross-examination, and the more rigorous exclusion of questions . . . of slight bearing on the bias and credibility of the witnesses, are not reversible errors.

11

*District of Columbia v. Clawans*, 300 U.S. 617, 632 (1937). Accordingly, it is not necessarily the case that an accused has a constitutional right in all instances to cross-examine a witness against him on any degree of bias the witness may have against a class to which the accused belongs, much less that a preclusion of such cross-examination necessarily constitutes an unreasonable application of Supreme Court law on the subject. The appropriate limits of cross-examination will vary with the particular circumstances. Biases are widespread. People tend to be more favorably and charitably disposed toward their own kin and kind, and less so toward historical adversaries. Montagues tend to stick with Montagues, Capulets with Capulets. It does not necessarily follow that any degree of such sentiment is likely to lead its possessor to falsify accusations against an accused.

The question before us in this case, however, does not require us to consider whether a trial judge is compelled by the Confrontation Clause to permit cross-examination on even the mildest forms of a witness's bias relating to a class to which the defendant belongs. The bias on which Brinson sought to cross-examine Gavin was not merely that he spoke in a disrespectful fashion or used a derogatory word. It was of an extreme form of bias. Brinson's offer of proof asserted that Gavin, in his job at a restaurant, refused to serve his employer's black patrons, stating that he would not serve "any fucking Niggers." (Brinson furthermore added credibility to the proffer of cross-examination by proposing, if Gavin denied it, to call Gavin's supervisor at the restaurant who would testify to those facts.) It is reasonable to suppose that one whose bias was of such intensity might distort or fabricate testimony against an object of his bias.

Given the intensity and extremity of the bias on which Brinson sought to examine Gavin, and the likelihood that one possessing a bias of such intensity might distort his testimony against an object of his bias on account of it, we find that it was not within a trial court's reasonable discretion to

12

preclude this cross-examination.[4] Nor was the Appellate Division's ruling a reasonable application of federal law, as determined by the Supreme Court. Brinson had a constitutional right under the Confrontation Clause to cross-examine Gavin on such extreme racial bias so that the jury could make its judgment whether Gavin's testimony was affected by bias, and in the circumstances it was an "unreasonable application of clearly established Federal law, as determined by the Supreme Court" to bar his exercise of that right on the ground that a racial bias is general rather than personally directed.[5]

**II.    Harmless Error**

The People contend that, even if the County Court violated Brinson's rights under the Confrontation Clause, any error was harmless. They argue that because Gavin promptly reported the robbery, accurately described Brinson's knife, and had Brinson's Social Security card, the evidence overwhelmingly established Brinson's guilt regardless of any racial bias testimony the defense could have presented. The Supreme Court recently clarified that, to assess the question of harmless error in such circumstances, courts should apply the test of *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007). Under *Brecht*, a court looks to whether the error had a

---

[4] Where the witness's bias against a race, nationality, religion, or class is of a mild form, unlikely to motivate the witness to fabrication and perjury, a trial court might well decide that cross-examination eliciting such bias may have a distracting and disruptive effect on the jury which exceeds its limited probative value, and therefore exercise its discretion to exclude such cross. We need not rule in this case whether such an exercise of discretion would be reasonable.

[5] As explained above, the trial court and the Appellate Division gave different reasons for justifying barring Brinson from cross-examining Gavin on his bias. The trial judge found the evidence "irrelevant" because it would demonstrate a bias two or three months after Gavin accused Brinson of the robbery. The People do not argue that the trial court's decision was reasonable under Supreme Court precedent, even if the Appellate Division's ruling was not. Accordingly, we need not consider it.

"substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637 (internal citation and quotation marks omitted).

The Supreme Court in *Van Arsdall* identified five factors courts should consider in assessing the effect of an erroneous limitation on cross-examination: "[1] the importance of the witness' testimony in the prosecution's case, [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, [4] the extent of cross-examination otherwise permitted, and . . . [5] the overall strength of the prosecution's case." 475 U.S. at 684. These factors favor Brinson.

As for the first and second factors – the importance of Gavin's testimony to the prosecution and whether it was cumulative – Gavin's testimony was more than important to the prosecution's case: Gavin was the sole witness to the alleged robbery. As for the third factor – the presence or absence of corroboration of Gavin's testimony on material points – the People contend it favors a finding of harmlessness because Brinson turned out to have a knife that matched the description Gavin gave and because Gavin had Brinson's Social Security card. Gavin's description of the knife and his possession of the card do indeed corroborate that there were dealings between Gavin and Brinson. But this was not contested by Brinson. He acknowledged that he and Gavin met that night and argued over Gavin's desire to buy drugs. Had Brinson's posture been to deny that he had had anything to do with Gavin, the knife and the card would have been strong corroboration of Gavin's version. But given Brinson's acknowledgment of their meeting and argument, those details do not corroborate Gavin's accusation that Brinson stole Gavin's money. Indeed, the fact that Brinson had no money on him when he was found by the police a short time following the alleged robbery raises some doubts about the accusation.

14

The fourth *Van Arsdall* factor looks at whether the effect of the defendant's deprivation of the particular cross-examination was diminished by other cross-examination the defendant was allowed. This factor strongly favors Brinson. The only question the trial court allowed on the issue of Gavin's bias was whether, after Brinson's arrest, Gavin had taunted him, calling him "Nigger," which Gavin denied. Brinson was denied the opportunity to question Gavin about his more extreme manifestation of bias – his refusal to serve black patrons of the restaurant – which Brinson, according to his proffer, could have corroborated through the testimony of Gavin's supervisor. The effect of the significant deprivation was certainly not neutralized by allowing Brinson to elicit Gavin's denial that he used a disparaging racial epithet. "While counsel was permitted to ask [the witness] *whether* he was biased, counsel was unable to make a record from which to argue *why* [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Davis*, 415 U.S. at 318 (emphasis in original). If Gavin had acknowledged his refusal to serve black patrons, or if Gavin had denied it but been contradicted by his supervisor, this demonstration of intense bias might well have raised serious doubts about whether Gavin was motivated by bias to testify falsely that Brinson committed robbery. The question Brinson was permitted to ask did not satisfy Brinson's right to impeach the witness for bias.

Coming to the final *Van Arsdall* factor – the overall strength of the prosecution's case – the evidence against Brinson was far from overwhelming. Both Gavin and Brinson testified that the two had had unpleasant dealings that night. There was nothing but Gavin's word to support his version that Brinson had robbed him. And Brinson was deprived by the court's ruling of his major defense – that Gavin was motivated by racial hatred to distort and fabricate.

15

At least as important as the five factors explicitly mentioned by the Supreme Court in *Van Arsdall* is whether the cross-examination of which the defendant was deprived was of a nature that was likely to affect the result. We have little doubt that eliciting Gavin's refusal in his job to serve "any fucking Niggers," either by Gavin's acknowledgment or by his denial, which could then have been contradicted by the testimony of his supervisor, might well have raised a serious question whether Gavin was so warped by racial hatred that his uncorroborated testimony that he was robbed by a black defendant would leave a reasonable doubt.

The district court found that the error was not harmless. In the district court's assessment, "Had the jury been permitted to hear the evidence concerning the complainant's alleged racial hostility, there is a reasonable likelihood that it would have decided that the complainant was not credible and could have accepted Brinson's version of the encounter between the two." 407 F. Supp. 2d at 482. We agree with the district judge that the jury might well have had significant doubts whether the complainant Gavin was credible. It seems to us less likely that the jury would have accepted Brinson's version at face value, because Brinson's version was in some respects implausible. The proposition that Gavin falsely accused Brinson of robbery because of Gavin's resentment that Brinson refused to sell Gavin ten dollars worth of weed for five dollars is already highly improbable, even given racial animosity. Brinson's further proposition that Gavin, previously a stranger, turned out after their altercation to be in possession of Brinson's Social Security card, which Brinson had lost about a month earlier, would push the limits of credibility beyond the breaking point. We therefore think it unlikely the jury would have accepted Brinson's version, even if they doubted Gavin's.

But that is largely irrelevant. The jury is not presented with a binary option – to accept either the complainant's version of the facts or the defendant's. The jury may not convict Brinson unless the

16

People's evidence proves him guilty beyond a reasonable doubt. In other words, in the context of this case, regardless of whether the jurors believed Brinson's version, they could not find him guilty unless they accepted Gavin's accusation as true. The jury might well have suspected that the truth lay somewhere between the two versions presented. Brinson testified that Gavin wanted to buy marijuana from him. Had the incident begun with some drug-related interaction between the two, which left Gavin angry and resentful, both participants might for obvious reasons have omitted this from their versions of the events. The jury would not need to believe Brinson's version in order to have reasonable doubts about Gavin's. We conclude that the erroneous and unreasonable prohibition of Brinson's cross-examination of Gavin as to his refusal to serve black patrons in his restaurant job had a "substantial and injurious effect or influence in determining the jury's verdict," thus satisfying the *Brecht* standard. We reject the People's argument that the error was harmless.

## Conclusion

The order of the district court granting the writ of habeas corpus is affirmed.