*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 18-CF-610

WONELL JONES, JR., APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF2-7067-17)

(Hon. Steven N. Berk, Trial Judge)

(Submitted November 13, 2019                    Decided November 18, 2021)

*Sicilia C. Englert* was on the brief for appellant.

*Allessandra Stewart*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the briefs were filed, *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Jennifer Loeb*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and EASTERLY, *Associate Judges*, and RUIZ, *Senior Judge*.

EASTERLY, *Associate Judge*:  Four months before Wonell Jones's arrest for possessing a gun, members of the Metropolitan Police Department's Gun Recovery Unit, including three of the four who later testified at Mr. Jones's trial, gathered for a photograph in what appears to be an MPD warehouse.  In the posed picture,

reproduced below, the GRU members are dressed in plainclothes (mostly black and olive green), with the majority wearing bulletproof vests. They are standing behind a banner held by two officers who are flanked on each side by officers holding riot shields. The banner bears a printed emblem. At the center is a large skull with a bullet hole in its forehead and crossbones underneath. Two handguns are above the skull. Handcuffs are at either side. An outline of wings frames the image. The acronym "NSID" (for the Narcotics and Special Investigation Division, which oversees the GRU) and "Gun Recovery Unit" appear atop the emblem. At the bottom, there is an apparent motto, "Vest Up, One in the Chamber," and below that, "Washington D.C.":



The government implicitly acknowledged that the group photograph was both favorable and arguably material to the defense, *see Vaughn v. United States*, 93 A.3d 1237, 1244, 1262 n.29 (D.C. 2014), and disclosed it to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).

At Mr. Jones's trial, defense counsel sought to use the group photograph with the skull-and-cross-bones-emblem-bearing banner to cross-examine the testifying GRU members about what counsel described as their "ends-justify-the-means mentality" to make arrests and get convictions. Counsel also sought to admit the group photograph as extrinsic evidence of bias. Sustaining the government's objection, the trial court prohibited the defense from doing either. The rationale for the court's ruling was twofold: (1) there was no "official finding" of misconduct in relation to the group photograph or the banner; and (2) because the jury might perceive the photograph as evidence of the GRU members' racism, the prejudicial effect of the photograph outweighed its probative value.

We conclude that neither rationale supported a ruling disallowing the defense from asking the GRU officers about the group photograph or admitting it into evidence. Although the government proposes that we affirm based on our own assessment of the probative value versus prejudice of the group photograph, we are

unable to do so because we cannot conclude as a matter of law that the probative value of the group photograph (or any questions about the photograph) was substantially outweighed by a danger of unfair prejudice. Nevertheless, because we conclude that the trial court's rulings were harmless in light of the other evidence in the case, we conclude reversal is not warranted on bias grounds.

We also determine that the trial court erred in admitting a recording of a police radio communication without resolving whether defense counsel had received the recording from the government prior to trial pursuant to his request for discovery under Super. Ct. Crim. R. 16 ("Rule 16"). But because the record reveals that the Rule 16 material was in fact turned over by the government, we conclude that this error was also harmless. Thus, we affirm Mr. Jones's convictions.

## I. Facts and Procedural History

According to the government's opening statement at trial, the members of the GRU "did what they're trained to do when people run from [them] for no reason; they chased [Mr. Jones]." During their pursuit, the GRU members saw Mr. Jones discard what appeared to be a gun. They recovered the gun, apprehended Mr. Jones, and placed him under arrest.

Nine members of the GRU were involved in Mr. Jones's arrest. The government presented testimony from four: Officers Jose Jaquez, Brandon Joseph, John Wright, and Matthew Hiller. The officers testified that, on the evening of Mr. Jones's arrest, just before 10 p.m., they had been driving in a convoy of three cars. Officer Jaquez was driving one of them, Officer Joseph was driving another, and Officer Wright and Officer Hiller were in a third. Each vehicle contained multiple GRU officers. The cars were unmarked, Officer Hiller explained, "[j]ust to help give a little bit [of an] element of surprise."

When Officer Wright saw a group of men on the side of the street, he called out to them and pulled over. As all four GRU members in Officer Wright's vehicle exited the vehicle, everyone on the street began to move away from the police, but Mr. Jones "took off in a full sprint." Officers Wright and Hiller gave chase. Both officers saw Mr. Jones reaching and struggling with his right hand at his waistband. After Mr. Jones's right arm "c[ame] free from his waistband" and lifted up, Officer Hiller alone saw "the outline of a firearm . . . come from him and land on the ground." Using the code word 1-800, he both called to Officer Wright and reported on the radio that he had seen a gun. Officer Hiller then stayed with the gun until it was collected as evidence.

Officer Wright continued running after Mr. Jones and was joined by Officer Joseph, who drove up parallel to Mr. Jones and exited his car to chase him. Mr. Jones was ultimately stopped when Officer Jaquez drove into his flight path and Mr. Jones collided with Officer Jaquez's vehicle. After Mr. Jones was apprehended, Officer Wright bagged the gun and brought it back to the station, where he processed it for fingerprints and DNA. He was unable to recover any prints, but he swabbed various parts of the gun for DNA and submitted the swabs for testing. According to a forensic analyst who testified at trial, one of the DNA profiles from the swabs (which contained a mixture of profiles) "matched" Mr. Jones's DNA.

The defense theory was that Mr. Jones had not dropped the gun that the GRU officers recovered and that they were somehow framing him. In addition to presenting testimony from two witnesses that Mr. Jones had not possessed a gun that day, defense counsel elicited testimony from the government's DNA analyst that DNA from one person can be transferred to an object by a second person without the first person ever touching the object.

Defense counsel also attacked the credibility of the GRU members. Specifically, counsel impeached their trial testimony that they were in the location of Mr. Jones's arrest because they had received a tip about a man with a gun with

both the Gerstein affidavit (prepared immediately after the arrest) and their grand jury testimony in which the GRU members had made no mention of such a tip. The defense also elicited admissions (1) from Officer Wright that two Superior Court judges had questioned his credibility in other cases, (2) from Officer Jaquez that Internal Affairs at the MPD had conducted a use of force investigation into Mr. Jones's injuries as a result of his collision with Officer Jaquez's car, but concluded there were "insufficient facts" that Officer Jaquez had intentionally struck Mr. Jones with the car, and (3) from Officer Joseph that he had been investigated for stealing money from an individual he and another officer had encountered sitting in a car. Lastly, counsel elicited testimony from Officer Hiller that the MPD "publish[es] statistics about how many firearms [the GRU] recovers," including on "social media and stuff."

Having heard this evidence, the jury found Mr. Jones guilty of one count of unlawful possession of a firearm in violation of D.C. Code § 22-4503(a)(1), (b)(1) (2012 Repl. & 2021 Supp.), one count of carrying a pistol without a license in violation of D.C. Code § 22-4504(a)(2) (2012 Repl. & 2021 Supp.), and one count of possession of an unregistered firearm in violation of D.C. Code § 7-2502.01(a) (2018 Repl.).

## II. The GRU Group Photograph with the Emblem-Bearing Banner

Defense counsel's cross-examination of the testifying GRU members was not as far-reaching as counsel wanted it to be. Three of the officers—Wright, Jaquez, and Joseph—appeared in the group photograph with the skull-and-cross-bones-emblem-bearing banner. But the defense was not permitted to question them about the group photograph or move the photograph into evidence.

Defense counsel was alerted to the existence of the photograph just before the first trial date when the case was before a different judge (Judge Epstein). The government informed counsel that as a result of a GRU member posting the photograph to social media, a civilian complaint had been filed, in turn prompting an MPD Internal Affairs investigation.[1] Defense counsel expressed an interest in cross-examining the officers about the photo and its contents at trial to explore two types of bias: the GRU officers' "motivation to curry favor with the [g]overnment"

---

[1] The government informed counsel that it could view the photograph and the complaint online and provided a link to a webpage: Law for Black Lives-DC Files Complaint Based on Violent Gun Recovery Unit Logo, Law4BlackLives DC (Aug. 17, 2017), http://www.law4blacklivesdc.com/blog/2017/8/17/law-for-black-lives-dc-files-complaint-based-on-violent-gun-recovery-unit-logo; https://perma.cc/6XAU-L9GB (last visited August 21, 2021). At the time this opinion was issued, the webpage, which still displayed the photograph, no longer appeared to contain a copy of the complaint.

as a result of having a case pending against them, and the bias inferable from the officers' participation in the photograph with the emblem-bearing banner. Counsel explained that the banner is "a symbol of, to a certain extent, oppression, that it's also a symbol of authority, and that the skull and crossbones . . . and the bullet hole in the head of the skull is a symbol that this is what happens to people who cross us." Because the court continued the trial to allow the defense to review the source material regarding the internal affairs investigation, the court did not rule on whether or how the defense could use the photograph at trial.

By the start of trial before a new judge (Judge Berk) months later, MPD had closed the Internal Affairs investigation. After jury selection, the court and counsel took up the issue of impeachment with the group photograph. The trial prosecutor represented to the court that the officers slated to testify in Mr. Jones's case had been "exonerated" of unspecified misconduct. In light of this development, the government argued that the defense lacked a "good-faith basis" to question the GRU members about the group photograph, and that the defense only sought to use the group photograph to make the GRU members "look like bad cops." The government also asserted that the defense was trying to paint the GRU members as racist and that it was trying to cross-examine them with "propensity" evidence.

Defense counsel disputed the government's assertion that there was no permissible basis to impeach the GRU members for posing with such a provocative emblem. Counsel both questioned whether the results of an internal MPD investigation constituted an "exoneration," and argued that "just because the MPD didn't sustain the findings" of misconduct did not mean that the GRU members could not be cross-examined "about their association and their conduct with the banner." Counsel argued that the photograph with the banner "signifies a mentality" or a "mindset" "that members of the gun recovery [unit] had about doing their job and how they were to go about doing their job," which counsel labeled an "ends-justify-the-means[2] mentality." Disavowing the government's suggestion that he was trying to "play[] a race card here," counsel argued he was "playing . . . what the evidence is": "[T]hey had a banner . . . that indicated that these officers were going to be not fairly aggressive [but rather] extremely aggressive. . . . [T]hey were going to do their job, and whether the law got in their way or not is another matter." Counsel argued that the GRU members were out to get "results" one way or another, and it did not matter for his proposed line of cross-examination that "they concentrated their efforts in the community which was heavily populated by people

---

[2] The transcript reflects that counsel said "ends-*that*-justify-the-means mentality" and that the court interjected a "yeah" in between "ends-that-justify-the-means" and "mentality."

of color" or that "Mr. Jones is African American." Instead, he reiterated, "[t]he deal . . . with this particular unit and with this particular banner has to do with a particular mindset as to what they were going to do to achieve the results and live up to the name 'gun recovery unit.'" Counsel argued he should be able to ask questions about the group photograph and put it into evidence to show that "these guys were . . . operating by a certain motto and a certain banner and certain mentality . . . at the time they made the arrest of Mr. Jones."

The court took the issue under advisement. In a post-hearing email to the court, the government continued to focus on the fact that the MPD had closed its investigation, but also argued that the "probative value of any cross-examination on this investigation . . . would be substantially outweighed by the risk of prejudice."

The next morning the court initially ruled that it would not allow the line of questioning because "the government's position [was] generally correct, that there cannot be cross-examination on issues in which there has not been an official finding" of misconduct. But after defense counsel protested that the group photograph "ha[d] nothing to do with whether or not this violated MPD policy," but rather went to "state of mind," the court offered an alternate rationale for precluding admission of the group photograph to probe the GRU members' bias. The court

ruled that "it's more prejudicial than probative. It would confuse the jury" because "they might think this case is about whether cops are racist or not."

When defense counsel reiterated that he wanted to use the photograph to cross-examine the officers about the unit's "general mentality" and not racism, the court ruled, "you can ask [the GRU members] questions about the mentality," but that it was "not allowing that banner." The parties appear to have understood the trial court to have precluded any questions about or attempt to introduce the group photograph with the emblem-bearing banner.

### A. Standard of Review

We generally review a trial court's evidentiary rulings for abuse of discretion. Among the many potential facets to our inquiry, *see Johnson v. United States*, 398 A.2d 354, 363-67 (D.C. 1979) (explaining the ways in which a trial court may abuse its discretion), we consider whether the challenged discretionary ruling was based on correct legal principles, *Longus v. United States*, 52 A.3d 836, 845 (D.C. 2012), and a correct apprehension of "the nature of the evidence," *id.* at n.28 (internal quotation marks omitted). Even if the trial court exercised its discretion in error, we

will not hold that the trial court "abused its discretion" unless "the impact of that error requires reversal." *Johnson*, 398 A.2d at 367.

## B. Explaining and Applying Bias Principles

Bias is an expansive concept that defies precise cataloguing. *See generally* 1 McCormick on Evidence § 39 (8th ed. 2020) (explaining that "[t]he kinds and sources of partiality" that may compromise a witness's credibility "are too varied to list exhaustively"). Bias encompasses not only "favor or friendly feeling toward a party," by virtue of a "family or business relationship . . . [or] membership in the same organization," and "hostility against a party," *id.* (footnote and emphasis omitted), but also a witness's "motive to lie" out of self-interest, *Longus*, 52 A.3d at 850 (internal quotation marks omitted), or a witness's "corruption," i.e., "a propensity or willingness to thwart the ascertainment of truth in a judicial proceeding," *id.* at 852 (internal quotation marks omitted); *accord Coles v. United States*, 808 A.2d 485, 489 (D.C. 2002) ("Bias may be induced by a witness'[s] like, dislike, or fear of a party, or by the witness'[s] self-interest" (quoting *United States v. Abel*, 469 U.S. 45, 52 (1984))); *Guzman v. United States*, 769 A.2d 785, 791 (D.C. 2001) ("[B]ias need not be personal for or against a party; other motives to fabricate fall within the doctrine."). In essence, bias broadly refers to any relationship or

reason that "might lead [a] witness to slant, unconsciously or otherwise, [their] testimony in favor of or against a party." *Coles*, 808 A.2d at 489 (quoting *Abel*, 469 U.S. at 52).

The potential existence of bias is a central concern at every trial. In our adversarial system, we want the factfinder—be it a judge or a jury—to "assess all evidence which might bear on the accuracy and truth of a witness'[s] testimony." *Abel*, 469 U.S. at 52. Simply put, we want them to consider the source of the information as well as the information itself. Because "[t]he bias of a witness may be a crucial component in the [factfinder's] assessment of the credibility of a witness[,] [it] is always a proper subject of cross-examination." *Foreman v. United States,* 792 A.2d 1043, 1056 (D.C. 2002) (internal quotation marks omitted); *see also Clayborne v. United States*, 751 A.2d 956, 962 (D.C. 2000) ("[A] party's effort to demonstrate bias may properly solicit over a wide range any information of potential value to the trier of fact in the assessment of credibility." (internal quotation marks omitted)); *accord Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." (internal quotation marks omitted)). Likewise, because bias is never a collateral issue, a party may introduce extrinsic evidence of bias. *Longus*, 52 A.3d at 852–53; *In re C.B.N.*, 499 A.2d 1215,

1219 (D.C. 1985).

Lines of bias questioning need only have "a reasonable factual foundation," which is a "fairly lenient" requirement. *Clayborne*, 751 A.2d at 963 (internal quotation marks omitted). To overcome an objection to such cross-examination, a party need only provide a "basis for [their] genuine belief that [their] questioning is well-grounded and hence that the answers may be probative of bias." *Id.* Extrinsic evidence of bias introduced during questioning must meet the ordinary relevance standard for "admissibility[,] [which] is low." *Coates v. United States*, 113 A.3d 564, 573 (D.C. 2015) (internal quotation marks omitted). To be relevant "[a]n item of evidence" must be material and probative, and to make the latter showing, "it need only tend to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *In re L.C.*, 92 A.3d 290, 297 (D.C. 2014); *accord Coates*, 113 A.3d at 573. Just like any other type of evidence, evidence of bias "may not be rejected as irrelevant merely because it is contradicted by other evidence." *Id.* at 574 (internal quotation marks omitted).

The commission of or commitment to engage in illegal or impermissible acts may serve as evidence of bias. *See, e.g.*, *Abel*, 469 U.S. at 52, 54 (membership in the Aryan Brotherhood, "a secret prison sect sworn to perjury and self-protection,"

was "certainly probative of bias"). But this is not a prerequisite for bias evidence. Likewise, a party's ability to ask questions probing a witness's bias and to introduce extrinsic evidence related to bias does not turn on the commencement (much less the completion) of an investigation of that witness and a finding of wrongdoing. To be sure, the existence of a still-pending law enforcement investigation may provide the basis for questioning about a specific type of bias, namely a possible "motive[] to curry favor with the government." *Longus*, 52 A.3d at 851–52. But the bias inferable from the alleged conduct itself (in *Longus*, coaching witnesses to give false testimony) may also provide the basis for bias questioning.[3] *Id.* at 851–54.

Applying these bias principles to this case, we conclude the trial court exercised its discretion in error when it made a blanket ruling that Mr. Jones could only impeach GRU members testifying for the government with the group

---

[3] *United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010), a *Brady* case cited by the government, is not to the contrary. The government quotes *Wilson* for the proposition that "the mere filing of a complaint against a witness is not probative of truthfulness or untruthfulness." 605 F.3d at 1005 (brackets and emphasis omitted) (quoting *United States v. Morrison*, 98 F.3d 619, 628 (D.C. Cir. 1996)). Setting aside that *Wilson* does not distinguish between bias and prior bad acts impeachment, *see* 605 F.3d at 1005–06, the D.C. Circuit explained in *United States v. Whitmore* that in *Morrison*, it had "not address[ed] what difference it might have made had the defendant sought to cross-examine the witness about the *substance* of the complaint." *Whitmore*, 359 F.3d 609, 621 (D.C. Cir. 2004) (internal quotation marks omitted).

photograph featuring the skull-and-cross-bones-emblem-bearing banner if there had been an official finding of wrongdoing in connection with the photograph or the banner (the court did not specify which). That ruling was unduly constricted and misapprehended the nature and purpose of a bias inquiry.

We are unpersuaded by the government's defense of the trial court's ruling. The government argues that proffered lines of bias questioning and extrinsic evidence of bias must be subjected to the test for admission of evidence of prior bad acts. *See Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 562 (D.C. 2001) (internal quotation marks and brackets omitted) (limiting impeachment based on "a prior bad act that has not resulted in a criminal conviction [to situations where] (1) the examiner has a factual predicate for the question, and (2) the bad act bears directly upon the veracity of the witness in respect to the issues involved in the trial"). In *Longus*, we sought "to lay to rest any suggestion that 'prior bad acts' of the witness are not admissible in bias examination." 52 A.3d at 853 n.29. But because "the government [had] not urge[d] this rationale on appeal," *id.*, we put our discussion of the distinction between bias and bad acts impeachment in a footnote. The government pursues in Mr. Jones's case the bad act analysis that it forewent, and we rejected, in *Longus*. We explain again why a bad acts impeachment analysis is not a legitimate rationale for precluding bias-related questions and excluding bias-

related evidence.

Impeachment with prior bad acts is analytically distinct from confrontation for bias. Impeachment with "a prior crime [or bad act] is . . . a general attack on the credibility of the witness," *Davis v. Alaska*, 415 U.S. at 316–17; such impeachment calls the witness's character into question generally, supporting an inference, bluntly stated, that the witness is "a lying liar."[4] By contrast, evidence of "biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand" is "a more particular attack on a witness's credibility." *Id.; accord Johnson v. United States*, 418 A.2d 136, 140 (D.C. 1980) ("The cross-examination of a witness, or presentation of evidence, as to his or her bias or motive is a more particularized, and potentially more damaging, way of calling into question a witness'[s] credibility").

Whether impeachment with prior bad acts is permitted is also procedurally independent of confrontation for bias. Impeachment with prior bad acts that result in certain convictions is authorized by D.C. Code § 14-305 (2012 Repl.), and proof

---

[4] Impeachment with prior bad acts to show an untruthful character is an exception to the general rule that evidence of a witness's character is barred to prove action in conformity therewith. *See Brown v. United States*, 726 A.2d 149, 152–53 (D.C. 1999).

of specified convictions with extrinsic evidence is allowed, § 14-305(b)(1); *see also*

*Sherer v. United States*, 470 A.2d 732, 738 (D.C. 1983).  Impeachment with a prior

bad act that has not resulted in a criminal conviction is authorized by the test set

forth in *Wagner*, 768 A.2d at 562, first adopted by our court in *United States v. Akers,*

374 A.2d 874, 878 (D.C. 1977); *see also Sherer*, 470 A.2d at 738.  "[T]o prevent the

trial from spinning off into a series of sub-trials on collateral issues," the use of

extrinsic evidence for bad acts impeachment is generally disallowed.  *In re C.B.N.*,

499 A.2d at 1218–19 (internal quotation marks and brackets omitted); *accord*

*Sherer*, 470 A.2d at 738.


Evidence of witness bias is not subject to these restrictions on character-based

impeachment, and as explained above, is never collateral.  Thus, even if conduct that

supports an inference of bias also constitutes a prior bad act, a defendant who has

made the requisite showing to pursue a bias theory on cross-examination may ask

bias-related questions and introduce extrinsic evidence about bias without having to

satisfy any additional requirements related to impeachment with prior bad acts.  *See,*

*e.g.*, *Longus*, 52 A.3d at 852–53 (evidence that a detective had coached government

witnesses to change their stories in another criminal case was admissible as evidence

of corruption bias); *In re C.B.N.*, 499 A.2d at 1219–20 (evidence that a government

witness had previously engaged in attempted blackmail was the proper subject of

bias questioning and provable by extrinsic evidence).

Because confrontation for bias and impeachment with prior bad acts are distinct modes of impeachment, a party may opt to pursue one but not the other. When a party seeks to probe a witness's bias, discussion of requirements for impeachment with prior bad acts is thus inapposite. As the Supreme Court explained in *Abel*:

> There is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible; quite the contrary is the case. It would be a strange rule of law which held that relevant, competent evidence which tended to show bias on the part of a witness was nonetheless inadmissible because it also tended to show that the witness was a liar.

469 U.S. at 56. *See id*. at 55-56 (acknowledging evidence of Aryan Brotherhood membership might "impeach [the witness's] veracity" as a prior bad act "probative of his character for truthfulness or untruthfulness," "intimat[ing] no view" whether, as such, it could be proved "by extrinsic evidence," and concluding "[i]t was enough that such evidence could properly be found admissible to show bias"); *accord Clayborne v. United States*, 751 A.2d 956, 965 n.9 (D.C. 2000) ("Impeachment of a witness's credibility with evidence of a prior bad act is not to be confused with the introduction of evidence of a prior bad act for substantive purposes, e.g., to prove motive or intent.").

In sum, we hold that the trial court was incorrect to preclude questioning about the group photograph with the banner and to bar admission of the photograph as extrinsic evidence of bias because there was no official finding of misconduct in relation to the group photograph, and we reject the government's argument that the group photograph, offered as evidence of bias, was properly excluded under the test for evidence of prior bad acts.

## C. Weighing Probative Value Against Unfair Prejudice

The trial court did not rely solely on the ground that the GRU members had been exonerated of misconduct to preclude the defense from using the group photograph to probe bias. It alternatively concluded that it would not allow the defense to ask questions about the photograph or show it to the jury because the photograph was "more prejudicial than probative" and "would confuse the jury."

Our court "adhere[s] to the view that probative evidence of bias, like probative evidence generally, should not be excluded because of crabbed notions of relevance or excessive mistrust of juries." *Clayborne*, 751 A2d at 963 (internal quotation marks omitted). Instead, bias evidence should be admitted at trial unless "its probative value is *substantially* outweighed by a danger of unfair prejudice,

confusion of the issues, or other legitimate concerns." *In re L.C.*, 92 A.3d 290, 298 n.24 (D.C. 2014); *accord Johnson,* 683 A.2d at 1099 ("announc[ing] that this court will follow FRE 403" and "tak[ing] note of its requirement that the danger of unfair prejudice *substantially* outweigh probative value before relevant evidence may be excluded").

The trial court interpreted the group photograph as potentially communicating racist attitudes among GRU members and excluded it as unduly prejudicial on that basis. But there are two problems with this reasoning. First, if the group photograph in fact supported a reasonable inference that the GRU was infected by racism, then that could have been yet another basis for its admission as bias evidence, not a special reason to exclude it. Racism, after all, is "[p]erhaps the plainest example of bias." New Wigmore Impeachment and Rehab. § 6.2 (1st ed. 2021).[5] Second, the

---

[5] *See also, e.g.*, *Brinson v. Walker*, 547 F.3d 387, 394–95 (2d Cir. 2008) (concluding that the trial court abused its discretion when it prevented bias cross-examination of a complainant who used a racial slur at his workplace sometime after the robbery at issue because "racial bias, at least when held in extreme form, can lead people to lie or distort their testimony," regardless of whether the "bias is directed generally against a class of persons and not specifically against the accused"); *Commonwealth v. Moorer*, 728 N.E.2d 288, 291 (Mass. 2000) (concluding that African American "defendant was entitled to inquire further" during cross-examination into "[t]he victim's comment that the defendant's face did not quite fit the MIT cap he was wearing," because the comment "created at least a remote possibility that he was racially biased").

group photograph in this case, which appears to display an almost even mix of Black and White GRU members, does not, at least without more factual context, support an inference of racist attitudes within the GRU. Defense counsel never sought to present this additional context; to the contrary, he disavowed using the photograph for this purpose and instead said he "d[id]n't care" for the purposes of this case that the GRU might "concentrate their efforts" in neighborhoods of color in the District of Columbia.

The government does not disavow the trial court's ruling that the group photograph was unduly prejudicial on the basis that it supported an inference that the GRU members are racist, arguing that "to the extent the photo could be perceived as racially charged it risked distracting the jury with questions of racism not relevant" to the issues presented at trial. In addition, it asserts that "[a]t best . . . this evidence was minimally probative" and "highly prejudicial," implications of racism aside. Regarding probative value, the government argues that it "strains logic to suggest that because certain officers posed with this banner, they were inherently biased, such that they might plant a gun or lie about appellant dropping this gun." Regarding prejudice, the government argues that the group photograph would be "confusing" and "require a trial within a trial to explain [its] potential significance." Effectively, in the absence of a properly-founded discretionary ruling from the trial

court, the government invites us to rule as a matter of law that the probative value of the group photograph (and any testimony about the group photograph) was substantially outweighed by the danger of unfair prejudice.

We hesitate to take this approach for a couple of reasons. First, in our view, how to assess the probative value of the group photograph to the defense is a nuanced question. Defense counsel wanted to ask the GRU officers about the photograph and show it to the jury because he argued it showed "the ends-justify-the-means mentality" of the GRU, specifically that they were going to be "extremely aggressive" in doing their job and get "results" to "live up to the name 'gun recovery unit'" "and whether the law got in their way or not is another matter." The group photograph with the banner certainly supports an inference that the members of the GRU have a strong group identity as a law enforcement unit, as evidenced by (1) their creation of a banner with a coat of arms, (2) their willingness to pose for a group picture with it in what appears to be an MPD facility, and (3) their publication of the photograph on social media.[6] Further, the group photograph supports an inference

---

[6] It appears GRU members have used the same emblem on clothing. At least one GRU member has worn clothing with the skull and crossbones emblem while carrying out an arrest. *See Howard v. United States*, 241 A.3d 554, 564 n.9 (D.C. 2020); *see also Golden v. United States*, 248 A.3d 925, 946 (D.C. 2021) (defense

that the GRU's mission is not to "protect and serve" but to frighten and control. The GRU officers' view of policing for guns as a form of urban combat, justifying the use of intimidation and violence, is supported by the motto "Vest up, One in the Chamber" and the bullet-shattered skull at the banner's center. The message, as aptly stated by defense counsel, is that this is "what happens to people who cross us." The inference that the GRU members' loyalty to their unit and antipathy towards their targets might result in biased testimony is more attenuated; we disagree with the government, however, that drawing this inference based on the group photograph would be wholly illogical. The GRU officers' willingness to abuse their power and use violence and intimidation in conducting stops on the street, as reflected by the photograph, could also allow a jury to infer their willingness at other stages of a criminal case to disregard the rights of their targets, promote their own power, and act outside the law. Accordingly, the group photograph with the banner provides some support for a more general inference of conscious or unconscious bias that could be proved by the photograph itself and probed by defense counsel in cross-examination of the GRU officers.

---

counsel proffered that a GRU member "had been seen wearing a sweatshirt with a violent logo and slogan evincing hostility toward gun suspects").

Second, it is far from clear to us that that admission of the group photograph and any questioning about the photograph would necessarily have "confuse[d]" the jury or required a "trial within a trial." Because of the court's adverse ruling, counsel was never asked to give a general proffer of the questions he intended to ask, but there is no indication in the record that counsel was seeking to elicit the backstory of the group photograph or ask questions about the internal investigation that ensued when the photograph came to light. To the extent counsel was simply seeking to ask the GRU members who testified at trial (three out of four of whom appeared in the photograph) about what the banner meant and what it indicated about the GRU officers' mentality, both as members of that unit and towards the communities it polices, we cannot say that *any* such questions would have created undue confusion or distraction.

All of this is to say that, based on this record, we are unable to determine as a matter of law that the probative value of the group photograph, both as evidence and the subject of cross-examination (followed by clarifying redirect as needed), was substantially outweighed by its prejudicial effect.[7] As an appellate court it is not our

---

[7] On the other hand, we cannot agree with Mr. Jones that his Sixth Amendment right to confront the witnesses against him was violated on the basis of the exclusion of this evidence. "The Sixth Amendment right to confrontation is violated . . . when the court precludes a *meaningful degree* of cross-examination." *Longus*, 52 A.2d at

job to make discretionary calls about the scope of questioning and the admissibility of extrinsic evidence about bias in the first instance. But while an improperly founded evidentiary ruling might well necessitate reversal in another case, here we conclude that affirmance is in order because the trial court's ruling was harmless.

## D. Evaluating Harm

We evaluate a showing of nonconstitutional error under the test set forth by the Supreme Court in *Kotteakos v. United States*, 328 U.S. 750, 765 (1946), and consider whether we can "say with fair assurance" that the error did not "substantially sway the jury's verdict." We conclude we can.[8]

---

850 (internal quotation marks omitted) (emphasis added). On this record, we cannot say that point was reached. The trial court ruled that counsel could ask the GRU members questions about their "ends-justify-the-means" mentality, just without the group photograph. But defense counsel did not attempt to ask any questions on this topic. Without a transcript showing how the questions defense counsel was permitted to ask were inadequate and without any argument from Mr. Jones explaining why questions about the GRU members' mentality without the group photograph could have backfired, we cannot say that the trial court precluded a meaningful degree of cross-examination on this topic so as to violate Mr. Jones's right to confrontation. *See Davis v. Alaska*, 415 U.S. 308, 318 (1974) (holding that the defendant was "denied the right of effective cross-examination" because the "limited cross-examination" permitted might have seemed like "a speculative and baseless line of attack on the credibility of an apparently blameless witness").

[8] "The standard for reversal where more than one error is asserted on appeal is whether the cumulative impact of the errors substantially influenced the jury's

We acknowledge that "[c]ross-examination concerning bias is especially important where . . . the credibility of a key witness is a central factor to be weighed by the trier of fact in a search for the truth." *Foreman*, 792 A.2d at 1056. If this case in fact hinged solely on the credibility of the GRU members, we would be compelled to reverse.[9] But defense counsel's efforts to make this case turn on the credibility of the GRU officers faced an obstacle: the DNA evidence that linked Mr. Jones to the gun. The forensic analyst who examined the DNA from the gun and the DNA from Mr. Jones did not work for the GRU. She was employed by a private, independent, accredited entity, Signature Science, in Austin, Texas. She testified that the random match probability for the DNA in this case was beyond miniscule, roughly one in undecillions.[10] The defense did not present its own expert and counsel made no meaningful effort to challenge her analysis or conclusions. Instead,

---

verdict." *Sims v. United States*, 213 A.3d 1260, 1272 (D.C. 2019) (internal quotation marks omitted). However, for reasons we discuss in Part III, the fact that the trial court also failed to fulfill its obligations under Rule 16 did not result in any additional harm.

[9] Counsel substantially impeached the officers on other subjects. In addition to highlighting for the jury the way in which the officers' story had changed about the reason they were in the area of Mr. Jones's arrest, counsel elicited admissions from Officer Wright that two Superior Court judges had questioned his credibility in other cases, from Officer Joseph that he had been investigated for theft in another case, and from Officer Jaquez that he had been investigated for improper use of force in Mr. Jones's case.

[10] An undecillion is a number equal to one followed by thirty-six zeros.

defense counsel explored the idea that Mr. Jones's DNA could have been transferred onto the gun by the officer who arrested Mr. Jones. But Mr. Jones developed no evidence to support this transference theory. Moreover, the record evidence makes it difficult if not impossible to discern how any transference could have occurred. Specifically, it was undisputed at trial that Officer Wright—the officer who recovered the gun from the scene, took it back to the stationhouse, and swabbed it for DNA—was not the officer who arrested Mr. Jones after he discarded the gun. The latter officer was Officer Joseph, but he could not have transferred Mr. Jones's DNA to the gun because he did not take possession of the gun until after Officer Wright swabbed it.

In light of the effectively uncontested DNA evidence in this case connecting Mr. Jones to the discarded gun, we conclude the trial court's erroneous exercise of discretion precluding admission of or any questioning about the group photograph was harmless.

## III. The Radio Communication

On the first day of testimony, the government moved into evidence a recording of a GRU radio communication, referred to as the "NSID Ops channel,"

during direct examination of Officer Hiller without any objection from the defense. Defense counsel objected the next day of trial, however, when the government sought to ask Officer Wright questions about the recording, claiming that it had not been disclosed prior to trial in violation of Rule 16. After a discussion at the bench in which the government proffered its belief that the recording had been disclosed via a cloud-based file exchange system, the trial court observed, "[i]t appears to the [c]ourt there had been efforts to disclose it. Whether or not it was disclosed in fact, I can't make th[at] conclusion . . . ." The trial court then ruled that it would nonetheless "allow the jury to hear [the recording]." Defense counsel renewed his objection on the last day of trial, stating he had not "found an e-mail from either [assigned government counsel] saying that we have an additional [recording of a] radio communication." The trial prosecutor reiterated her belief that it had been provided to the defense, and said that she would "file . . . in the record" "several emails" from the previously assigned Assistant United States Attorney to defense counsel "alerting him to the existence of this [recording]." Without reviewing the emails and over defense counsel's continued objection, the trial court once again admitted the recording, and the government again played the recording for the jury during closing to argue that Mr. Jones was the suspect described by police in the radio communication.

Mr. Jones maintains on appeal that the government never provided the NSID Ops channel recording prior to trial. He argues that the trial court "erred by admitting the recording without resolving the dispute over whether or not it was disclosed" and thus whether the government had fulfilled its disclosure obligations under Rule 16. We agree that the trial court erred.

Super. Ct. Crim. R. 16(a)(1)(E)(ii) provides in relevant part that "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, [and] tangible objects . . . if the item is within the government's possession, custody, or control and . . . the government intends to use the item in its case-in-chief at trial." Super. Ct. Crim. R. 16(d)(2)(C) further provides that "[i]f a party fails to comply with this rule, the court may . . . prohibit that party from introducing the undisclosed evidence [or] enter any other order that is just under the circumstances." In other words, it is the court's job to oversee compliance with Rule 16, and when the court is faced with conflicting proffers about whether the requisite disclosures have been timely made, it is the court's job to conduct a further inquiry and resolve the matter. *See Askew v. United States*, 229 A.3d 1230, 1243–44 (D.C. 2020). It is not an option for a court to say, as the court did here, that it cannot make a determination regarding the government's compliance with Rule 16 and then overrule a defense objection to the

admission of evidence subject to disclosure under the rule.

Although the trial court erred in this respect, the record on appeal, including government filings and transcripts of pretrial proceedings, *see* D.C. App. R. 10(a), contains undisputed information that resolves the question and renders this failure harmless by any standard. *See* D.C. Code § 11-721(e) (2012 Repl.). Specifically, the record contains an October 29, 2017, email from the first prosecutor on the case to defense counsel stating, "I hope to have additional *Jencks* for you on Monday. I've been told repeatedly that all of the recordings from the incident have already been provided to me (RR and TAC), but my officers believe that they utilized the NSID Ops channel during the incident." This prosecutor added that the officers' "statements on the NSID Ops channel are, I believe, memorialized in the Gerstein. I'm still tracking this recording (if any) down, and am hoping to have [it] to you on Monday morning." Parties discussed this matter in court the next day. The prosecutor stated, "I am . . . handing over the last [radio run] recording that was missing, the NSID Ops [channel]," adding that the recording was "also provided by email, and it has also been provided on the USA dropbox, but also now on CD." The case was continued overnight so that defense counsel could review the discovery, and when the parties returned to court, counsel asked for a continuance so that his client could review, among other materials, "the additional radio communications

that were provided by the government yesterday."

The government set forth these details of its pretrial disclosure of this recording in its brief to this court, and Mr. Jones did not dispute this record evidence or suggest further inquiry was necessary in a reply brief. Accordingly, we conclude that the trial court's failure to conduct an inquiry to confirm that this information had in fact been disclosed was harmless.

For the foregoing reasons, the judgment of the Superior Court is affirmed.

*So ordered.*